Docket No. 15-15106

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

DRK Photo, a Sole Proprietorship,

*Plaintiff-Appellant*,

v.

MCGRAW-HILL GLOBAL EDUCATION HOLDINGS, LLC and
MCGRAW-HILL SCHOOL EDUCATION HOLDINGS, LLC

*Defendants-Appellees*.

_____

*Appeal from a Decision of the United States District Court for the District of Arizona, Prescott,
No. 3:12-cv-08093-PGR – Honorable Paul G. Rosenblatt*

# BRIEF OF APPELLEES

CHRISTOPHER P. BEALL, ESQ.
THOMAS B. KELLEY, ESQ.
MICHAEL BEYLKIN, ESQ.
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1888 Sherman Street, Suite 370
Denver, CO 80203
(303) 376-2400 Telephone
(303) 376-2401 Facsimile

*Attorneys for Appellees McGraw-Hill
Global Education Holdings, LLC and
McGraw-Hill School Education
Holdings, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellees/Defendants McGraw-Hill Global Education Holdings, LLC ("MHGEH") and McGraw-Hill School Education Holdings, LLC ("MHSEH") (collectively "McGraw-Hill Education" and/or "MHE"), both limited liability companies organized under the laws of the State of Delaware and with their principal places of business in New York City, New York, hereby state that neither MHGEH nor MHSEH has a parent corporation, and that there are no publicly-held corporations that own 10% or more of either MHGEH or MHSEH stock. MHE furthers states that:

- Certain investment funds affiliated with Apollo Global Management, LLC ("AGM") indirectly own a majority of the membership interests in both MHGEH and MHSEH. AGM's Class A Shares are publicly traded on the New York Stock Exchange (NYSE: APO).

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .......................... 3

STATEMENT OF THE CASE ................................................. 4

    A.    Factual Background ......................................... 4

        1.    Invoicing Relationship Between the Parties ............................ 4

        2.    DRK's Relationship with The Photographers:  The Non-Exclusive Representation Agreements .................................... 5

        3.    DRK's Relationship with The Photographers:  The Sham "Transfer Agreements" .......................................... 5

    B.    A Federal Court Finds DRK Lacks Standing in Earlier-Filed Lawsuit Against John Wiley & Sons, Inc. .......................... 7

    C.    MHE's Motion For Summary Judgment As to DRK's Lack of Standing to Assert Copyright Infringement Claims is Granted.......... 9

SUMMARY OF THE ARGUMENT .................................................14

ARGUMENT................................................................16

    I.    THE DISTRICT COURT PROPERLY FOUND THAT THE "TRANSFER AGREEMENTS" DID NOT ACTUALLY TRANFER ANY COPYRIGHT OWNERSHIP TO DRK ...............16

    II.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE NON-EXCLUSIVE REPRESENTATION AGREEMENTS DID NOT CONFER STANDING ON DRK....................................28

        A.    The Non-Exclusive Right to "Authorize" Others to Use A Copyrighted Work is Not an Exclusive Right under Section 106 of the Copyright Act...........................29

B.     DRK's Status as a Non-Exclusive Licensing Agent Does Not Make It A Beneficial Owner of an Exclusive Copyright Interest ................................................33

III.    THE SUPREME COURT'S RULINGS IN *LEXMARK* AND *SPRINT* DID NOT ALTER OR AMEND THE REQUIREMENTS FOR STATUTORY STANDING UNDER 17 U.S.C. § 501(b) ........40

A.    *Lexmark* Does Not Amend or Alter the Analysis under 17 U.S.C. § 501(b)........................................................40

B.    DRK's Policy Arguments in Favor of Expanding the Class of Parties with Standing to Sue Under the Copyright Act Are Misdirected................................44

C.    *Sprint* Did Not Even Remotely Touch Upon, Let Alone "Abrogate" This Court's Holding (and the Universal View) That a Bare Right to Sue Is Ineffectual for Statutory Standing Under 17 U.S.C. § 501(b) ........................46

IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REJECTING DRK'S ATTEMPT TO FUNDAMENTALLY RESHAPE THE CASE AFTER TWO YEARS ...............................48

CONCLUSION ....................................................55

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS..........57

STATEMENT OF RELATED CASES ..............................58

ADDENDUM

*Visuals Unlimited, Inc.*, No. 11 143Y00658 13, Order No. 6 (AAA Sept. 10, 1013) .................................... A-1

17 U.S.C. § 106 ......................................................... A-6

17 U.S.C. § 501(b)................................................... A-7

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acri v. Int'l Assoc. of Machinists & Aerospace Workers*,
  781 F.2d 1393 (9th Cir. 2011)............................................................51

*Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*,
  747 F.3d 673 (9th Cir. 2014)............................................................27

*Alaska Stock, LLC v. Pearson Educ., Inc.*
  975 F. Supp. 2d 1027 (D. Alaska 2013) ...........................................26

*AmerisourceBergen Corp. v. Dialysist W., Inc.*,
  465 F.3d 946 (9th Cir. 2006)............................................................50

*Apparel Bus. Sys., LLC v. Tom James Co.*,
  2008 WL 858754 (E.D. Pa. Mar. 28, 2008).....................................28

*Armento v. Laser Image, Inc.*,
  950 F. Supp. 719 (W.D.N.C. 1996)..................................................31

*Bavendam v. Pearson Educ., Inc.*,
  No. 2:13-cv-03096-FSH-MAH (D.N.J. filed May 15, 2013)............44

*Bean v. McDougal Littell*,
  669 F. Supp. 2d 1031 (D. Ariz. 2008) ..............................................27

*Bourne Co. v. Hunter Country Club, Inc.*,
  990 F.2d 934 (7th Cir. 1993)............................................................30

*Brandenberg v. Pearson Education, Inc.*,
  No. 2:13-cv-03319-FSH-MAH (D.N.J. filed May 23, 2013)............44

*Choike v. Slippery Rock Univ. of Penn. of State Sys. of Higher Educ.*,
  297 F. App'x 138 (3d Cir. 2008)......................................................54

*Clifton v. John Wiley & Sons, Inc.*,
  No. 4:13-cv-02923-JSW (N.D. Cal. filed June 25, 2013) ................44

*Comptoir de l'Industrie Textile de France v. Fiorucci, Inc.*,
  1979 WL 1062 (S.D.N.Y. Apr. 10, 1979) ........................................36

Page(s)

*Ctr. City Music v. Kisner*,
   1994 WL 159769 (4th Cir. Apr. 28, 1994) ......................................30

*Dun & Bradstreet, Inc. v. Walter*,
   1991 WL 32749 (N.D. Ill. Mar. 7, 1991) ........................................38

*In re E.R. Fegert, Inc.*,
   887 F.2d 955 (9th Cir. 1989)..........................................................18

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
   697 F.2d 27 (2d Cir. 1982).......................................................17, 47

*Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*,
   619 F.3d 1223 (10th Cir. 2010).....................................................54

*Effects Assocs., Inc. v. Cohen*,
   908 F.2d 555 (9th Cir. 1990)....................................................30, 31

*Ellis v. Pearson Educ., Inc.*,
   No. 2:13-cv-03320-FSH-MAH (D.N.J. filed May 23, 2013)...........................44

*Engelbert v. McGraw-Hill Global Educ. Holdings, LLC*,
   No. 5:14-cv-02062-LS (E.D. Pa. filed Apr. 8, 2014)......................................44

*Evident Corporation v. Church & Dwight Co.*,
   399 F.3d 1310 (Fed. Cir. 2005).......................................................31

*Fantasy, Inc. v. Fogerty*,
   654 F. Supp. 1129 (N.D. Cal. 1987)................................................34

*Fed. Treasury Enters. Sojuzplodoimport v. SPI Spirits Ltd.*,
   726 F.3d 62 (2d Cir. 2013)............................................................53

*Foust v. Page*,
   2014 WL 1791250 (D. Ariz. May 6, 2014) .....................................51

*Godinez v. CBS Corp.*,
   81 F. App'x 949 (9th Cir. 2003)....................................................21

*Granite Music Corp. v. Ctr. St. Smoke House, Inc.*,
   786 F. Supp. 2d 716 (W.D.N.Y. 2011)...........................................30

Page(s)

*Harris v. Emus Records Corp.*,
734 F.2d 1329 (9th Cir. 1984)........................................................30

*Henderson v. City & Cty. of S.F.*,
2006 WL 3507944 (N.D. Cal. Dec. 1, 2006)....................................52

*Hulex Music v. C.F. Maint. & Prop. Mgmt., Inc.*,
115 F.R.D. 303 (D. Neb. 1987)........................................................30

*HyperQuest, Inc. v. N'Site Solutions, Inc.*,
632 F.3d 377 (7th Cir. 2011)................................................ 17, 25, 27, 30, 47

*Iridium India Telecom Ltd. v. Motorola, Inc.*,
165 F. App'x 878 (2d Cir. 2005)......................................................53

*J.P. Morgan Chase Bank, N.A. v. Drywall Serv. & Supply Co.*,
265 F.R.D. 341 (N.D. Ind. 2010) ....................................................52

*Jicarilla Apache Tribe v. Hodel*,
821 F.2d 537 (10th Cir. 1987).........................................................54

*Jinro Am. Inc. v. Secure Invs., Inc.*,
266 F.3d 993 (9th Cir. 2001)...........................................................19

*John Wiley & Sons, Inc. v. DRK Photo*,
998 F. Supp. 2d 262 (S.D.N.Y. 2014)
............................................... 8-11, 18, 21, 22, 24-30, 34, 48, 50-51, 54

*Johnson v. Mammoth Recreations, Inc.*,
975 F.2d 604 (9th Cir. 1992)............................................. 13, 49, 50

*Kleinhans v. Lisle Sav. Profit Sharing Tr.*,
810 F.2d 618 (7th Cir. 1987)...........................................................52

*Lans v. Gateway 2000, Inc.*,
84 F. Supp. 2d 112 (D.D.C. 1999) ..................................................53

*Lanting v. Pearson Educ., Inc.*,
No. 2:13-cv-03318-FSH-MAH (D.N.J. filed May 23, 2013)............44

**Page(s)**

*Lewis v. Russell*,
2012 WL 4711959 (E.D. Cal. Oct. 3, 2012) ..................................................51

*Lexmark Int's, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377 (2014) ........................................3, 11, 14, 40, 41, 42, 43, 44, 46

*Matsumoto v. Republic Ins. Co.*,
792 F.2d 869 (9th Cir. 1986) ...............................................................................54

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
---F.3d ---, 2015 WL 4547593 (9th Cir. July 29, 2015) ..........................5, 31, 33

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
10 F. Supp. 3d 1117 (N.D. Cal. 2014) ........................................... 11, 30, 34, 53

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
2013 WL 1995208 (N.D. Cal. May 13, 2013) ...........................................11, 25

*Minden Pictures, Inc. v. Pearson Educ., Inc.*,
929 F. Supp. 2d 962 (N.D. Cal. 2013) ........................................... 11, 25, 27, 44

*Modus LLC v. Encore Legal Solutions, Inc.*,
2014 WL 1493000 (D. Ariz. Apr. 16, 2014) ............................................33, 51

*Moran v. London Records, Ltd.*,
827 F.2d 180 (7th Cir. 1987) ............................................................. 37, 38, 39

*Motta v. Samuel Weiser, Inc.*,
768 F.2d 481 (1st Cir.1985) ...............................................................................47

*MSC Music Am., Inc. v. Yahoo! Inc.*,
No. 3:09-cv-00597, 2009 WL 4348593
(M.D. Tenn. Nov. 24, 2009)...........................................................................36

*NAACP v. New York*,
413 U.S. 345 (1973) ...........................................................................................53

*Nicklin v. Pearson Educ., Inc.*,
No. 2:13-cv-03176-FSH-MAH (D.N.J. filed May 20, 2013)...........................44

**Page(s)**

*Nix v. Dalton*,
  1996 WL 742437 (9th Cir. 1996) ....................................................51

*Olander Enters. Inc. v. Spencer Gifts, LLC*,
  812 F. Supp. 2d 1070 (C.D. Cal. 2011) ..........................................45

*Order of St. Benedict of N.J. v. Steinhauser*,
  234 U.S. 640 (1914)...............................................................35, 36

*Original Appalachian Artworks, Inc. v. Schlaifer Nance & Co.*,
  679 F. Supp. 1564 (N.D. Ga. 1987)..................................................36

*Pacific Stock, Inc. v. Pearson Education, Inc.*,
  927 F. Supp. 2d 991 (D. Haw. 2013)...............................................26

*Pfizer Inc. v. Teva Pharm. USA, Inc.*,
  803 F. Supp. 2d 409 (E.D. Va.)......................................................37

*Plunket v. Doyle*,
  2001 WL 175252 (S.D.N.Y. Feb. 22, 2001)....................................36

*Prather v. Neva Paperbacks, Inc.*,
  410 F.2d 698 (5th Cir. 1969)....................................................46, 47

*Premier Tracks, LLC v. Fox Broad. Co.*,
  No. 12-cv-01615 DMG (PJWx) (N.D. Cal. Dec. 18, 2012)........................33, 34

*Ray Charles Found. v. Robinson*,
  919 F. Supp. 2d 1054 (C.D. Cal. 2013) .....................................34, 43

*Righthaven LLC v. Hoehn*,
  716 F.3d 1166 (9th Cir. 2013)........................16-19, 22-29, 43, 46, 47

*Righthaven LLC v. Wolf*,
  813 F. Supp. 2d 1265 (D. Colo. 2011) .......................................45, 47

*Siegel v. Warner Bros. Entm't Inc.*,
  658 F. Supp. 2d 1036 (C.D. Cal. 2009) ..........................................31

*Silvers v. Sony Pictures Entm't, Inc.*,
  402 F.3d 881 (9th Cir. 2005)..........................16, 17, 29, 35, 43, 46, 47

**Page(s)**

*Smith v. Casey*,
741 F.3d 1236 (11th Cir. 2014)................................................................35, 36

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
554 U.S. 269 (2008)........................................................... 3, 15, 40, 46, 47, 48

*Sybersound Records, Inc. v. UAV Corp.*,
517 F.3d 1137 (9th Cir. 2008)..........................................................................33

*Taylor v. State Farm Mut. Auto. Ins. Co.*,
854 P.2d 1134 (Ariz. 1993)..............................................................................20

*United States v. Washington*,
86 F.3d 1499 (9th Cir. 1996)............................................................................53

*Urantia Found. v. Maaherra*,
114 F.3d 955 (9th Cir. 1997).............................................................................31

*Viesti Assocs., Inc. v. McGraw-Hill Global Educ. Holdings, LLC*,
2015 WL 585806 (D. Colo. Feb. 11, 2015)...................11, 25, 28, 30, 42, 44, 55

*Viesti Assocs., Inc. v. Pearson Educ., Inc.*,
2014 WL 1053772 (D. Colo. Mar. 19, 2014) ...............11, 25, 27, 30, 34, 39, 40

*Viesti Assocs., Inc. v. Pearson Educ., Inc.*,
2014 WL 1055975 (D. Colo. Mar. 19, 2014) ..........11, 25, 27, 28, 30, 34, 39, 40

*Visuals Unlimited, Inc., v. John Wiley & Sons, Inc.*,
No. 11143Y0065813, Order No. 6 (AAA Sept. 10, 1013)................................30

*Visuals Unlimited, Inc. v. John Wiley & Sons, Inc.*,
No. 11143Y0065813, Order No. 5 (AAA Aug. 14, 2013)................................11

*Warner/Chappell Music, Inc. v. Blue Moon Ventures*,
No. 3:10-1160, 2011 WL 662691 (M.D. Tenn. Feb. 14, 2011) .................36, 37

*Warren v. Fox Family Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003)..........................................................................35

*Wolfenbarger v. Black*,
2008 WL 590477 (E.D. Cal. Feb 29) ...............................................................54

**Page(s)**

*Wooster v. Crane & Co.*,
   147 F. 515 (8th Cir. 1906).........................................................35, 36

*In re Zicam Cold Remedy Mktg., Sales Practices, and Prods. Liab.*
   *Litig.*,
   2010 WL 3719908 (D. Ariz. Sept. 15, 2010)....................................51

*Zivkovic v. S. Cal. Edison Co.*,
   302 F.3d 1080 (9th Cir. 2002)...............................................50, 55


**Statutes**

15 U.S.C. § 1125(a)(1)(B) ...............................................................41

17 U.S.C.
   § 106................................................. 1, 10, 14, 16, 17, 27, 29, 31, 32, 33, 34, 36
   § 204(a) ..............................................................................27
   § 412..................................................................................45
   § 501(b) ....... 1, 3, 9, 11, 14, 15, 17, 27, 28, 29, 33, 35, 38, 40, 41, 43, 46, 47, 48
   § 504(c) ..............................................................................45
   § 505..................................................................................45


**Other Authorities**

37 C.F.R. § 202.3...........................................................................27

DAVID NIMMER, NIMMER ON COPYRIGHT § 10.01[c][4] (1983).............................30

DAVID NIMMER, PROPOSAL FOR SMALL COPYRIGHT INFRINGEMENT
   CLAIMS 9 (Jan. 17, 2012)...........................................................46

FED. R. CIV. P. 16(b)(1).................................................................49

FED. R. CIV. P. 24.................................................................53, 54, 55

H.R. REP. NO. 94-1476 (1976), *as reprinted in* 1976 U.S.C.C.A.N.
   5659.............................................................................38, 39

**Page(s)**

MELVILLE B. NIMMER & DAVID NIMMER, 3 NIMMER ON COPYRIGHT
§ 12.02[D] (2014) ............................................................................39

RESTATEMENT (SECOND) OF CONTRACTS § 21 (1981) .............................................19

WILLIAM F. PATRY, 2 PATRY ON COPYRIGHT § 5:152 n.1 (2014) ...........................34

# INTRODUCTION

The district court properly held that DRK lacked standing to bring its copyright infringement claims.  DRK's gambit was simple: create the mere appearance of a transfer of copyright ownership of the photos from the photographers it represented on a non-exclusive basis, while effecting no actual change in the status quo of ownership of any exclusive right of copyright.  The gambit was flawed as a matter of law.

As the well-established case law makes clear, to have standing to assert copyright infringement claims under 17 U.S.C. § 501(b), DRK must either (a) actually own the copyright in the photos, or (b) be the *exclusive* licensee of one of the rights enumerated under 17 U.S.C. § 106.  To try to meet the requirements for standing, DRK relies on (a) copyright assignment agreements ("Transfer Agreements") from the photographers, which nominally announce a transfer of copyright, but were executed solely to manufacture the mere appearance of an ownership interest, and (b) *non-exclusive* agency agreements with the photographers ("Representation Agreements").  After analyzing the *substance* of the rights actually acquired by DRK, the district court – and another federal court previously – correctly found that the former are "sham" transactions that transferred to DRK only "the bare right to sue" on behalf of the copyright owners,

and that the latter merely establish DRK's status as a non-exclusive licensing agent for the photos and transfer no ownership.

DRK now seeks to justify its flawed scheme with a variety of post-hoc rationales. None hold water and there is no doubt that the district court properly found that DRK never acquired any legal or beneficial ***ownership*** of the copyrights in the photos at issue on appeal here, and therefore DRK lacks standing to sue MHE under the Copyright Act.

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

1.     Did the district court correctly find that the "Transfer Agreements" were nothing more than assignments of a bare right to sue and thus ineffectual under the well-established case law to convey any copyright ownership to DRK sufficient for standing under 17 U.S.C. § 501(b)?

2.     Did the district court correctly find that the "Representation Agreements" between the photographer-authors and DRK did not convey any exclusive copyright ownership to DRK?

3.     Did the district court correctly find that the Supreme Court's decisions in *Lexmark* and *Sprint* have not altered or amended the express requirements for statutory standing under Section 501(b) of the Copyright Act.

4.     Did the district court correctly exercise its discretion in refusing to grant DRK leave to amend the Complaint more than two years after the litigation was commenced, two years after the applicable scheduling order deadline, five months after another district court had held DRK's claims for standing to be legally ineffective, and after the district court below had already dismissed with prejudice almost all of DRK's improperly aggregated claims after full briefing on cross-motions for summary judgment?

## STATEMENT OF THE CASE

**A.     Factual Background**

**1.     Invoicing Relationship Between the Parties**

Plaintiff DRK is a stock photo licensing agency that sells non-exclusive

licenses for use of stock photos,[1] created by others, to various publishers, including

MHE, for a few hundred dollars per photo.  ER 175-80, 420 ¶ 2; SER[2] 64-67.

MHGEH is a publisher of post-secondary, professional, and trade textbooks and

publications.  SER 1-6.  MHSEH is a publisher of K-12 educational textbooks and

other materials.  *Id.*  DRK filed the Complaint on May 15, 2012 alleging, largely

on information and belief, that MHE exceeded the terms of invoicing between the

parties for photos DRK licensed, on behalf of numerous non-party photographers,

to MHE since 1997.  ER 419-566.

Because DRK is not the author of any of the photos that serve as the basis

for its copyright infringement claims, ER 427-566 (identifying no fewer than

seventy different authors of the photos at issue, none of which is DRK), DRK

---

[1] "Stock" photos are of ordinary and commonplace items, readily fungible
with other photographs.  Photos at issue in this case include, for example, a picture
of a bear, a tree or a landscape.  *E.g.*, ER 431, 461, 464.

[2] MHE cites its Supplemental Excerpts of the Record, submitted
contemporaneously herewith, as "SER __."

relies on two sets of agreements with the photographers as a purported basis for its copyright ownership.

### 2. DRK's Relationship with The Photographers: The Non-Exclusive Representation Agreements

DRK obtains the photos in its collection through a series of non-exclusive representation agreements (hereinafter "Representation Agreements") with photographers, by which DRK was authorized to serve as a licensing agent for the photographers. ER 175-80, 183-226, 420 ¶ 2; SER 65-66.[3] As DRK admitted below, SER 132-35 ¶¶ 3-7, and consistent with the language of the agreements themselves, nearly all of the "Representation Agreements" merely appointed DRK as a non-exclusive licensing agent, and the photographers retained their copyrights. ER 183-226; SER 65-66, 68-75, 85-89, 94-102.

### 3. DRK's Relationship with The Photographers: The Sham "Transfer Agreements"

---

[3] With respect to nine of the photographers on whose photos DRK attempted to prosecute copyright infringement claims, DRK was the exclusive licensing agent. SER 44 n.6, 51-52 ¶¶ 5-7; *cf.* ER 228, 231, 234 (appointing DRK the "sole and exclusive agent"). The claims as to those nine photographers were already settled by the parties, with prejudice, and are thus not at issue in this appeal. ER 31-33. Indeed, this court's recent decision in *Mindn Pictures, Inc. v. John Wileey & Sons, Inc.* (*Minden III*), --- F.3d ---, 2015 WL 4547593, at *7 (9th Cir. July 29, 2015), *see* discussion *infra* at 31-33, – where the panel found agreements like the DRK ones **not at issue here**, which provided that the plaintiff was a "**sole and exclusive agent** . . .with respect to the Licensing" were sufficient for standing – is not relevant to this appeal precisely because MHE and DRK have already settled all claims as to photos subject to such agreements.

In June 2008, DRK and its counsel initiated a scheme to bring copyright infringement actions against textbook publishers to assert decades-old claims on behalf of photographers whose works were in DRK's collection, notwithstanding the fact that DRK did not own the copyrights at issue.  SER 80-81; ER 175-80, 236-83, 287-97.  To effectuate this plan, DRK's principal, Daniel Krasemann, contacted the photographers and asked them to sign so-called "Copyright Assignment, Registration, and Accrued Causes of Action Agreement" (hereinafter "Transfer Agreements").  *See, e.g.*, ER 236-83, 287-97; SER 137 ¶¶ 14-15.

DRK's email transmitting the "transfer" agreement form told the photographers that DRK was "initiating a copyright registration program with the United States Copyright Office," that "[w]ith a Certificate of Registration in hand . . . we will be in a much stronger position with much more leverage for settling copyright infringement claims," and that the "Agreement is not a permanent assignment."  ER 260-81.  DRK admitted that the sole purpose of the "transfer" agreement form was to allow DRK to register the photos "as the 'copyright holder by assignment'" and for DRK "to have the legal standing with the courts to pursue would be infringers."  ER 260-81, 301, 316-24; SER 78-84, 95-97; *see also* ER 294-97 (DRK's principal assured the photographers that there was "no 'rights grab' going on here").  Further, and consistent with the language in the earlier Representation Agreements, the "Transfer Agreements" began by confirming that

the photographers, not DRK, owned the copyrights: "[t]he undersigned photographer, *the sole owner of the copyrights* in the undersigned's images . . . hereby grants to DRK . . . ." ER 236-58 (emphasis added).

Discovery in this (and in a parallel case against John Wiley & Sons, Inc.) revealed that these Transfer Agreements, which only nominally addressed copyright rights, were created solely for the mere appearance of copyright ownership, and did not effectuate any actual transfer exclusive copyright rights. ER 16-27. Prior to execution of the Transfer Agreements, DRK assured photographers that the transaction would have no effect on their abilities to license the transferred photos through other agencies. ER 316-24; SER 78-84. DRK admitted that after execution of the Transfer Agreements, the photographers remained free to license the photos themselves without accounting to DRK because the Transfer Agreements effected no change to their relationship with DRK, which remained governed by the Representation Agreements. ER 316-24; SER 78-84, 138-39 ¶¶ 20-22.

## B. A Federal Court Finds DRK Lacks Standing in Earlier-Filed Lawsuit Against John Wiley & Sons, Inc.

DRK's suit against MHE was not its first attempt to claim standing for photos for which it served only as a non-exclusive licensing agent. DRK made, and another federal district court rejected, the *identical* standing arguments involving the *very same* photographers, *very same* Representation Agreements,

and the ***very same*** Transfer Agreements in *John Wiley & Sons, Inc. v. DRK Photo* (*Wiley*), 998 F. Supp. 2d 262, 279, 284 (S.D.N.Y. 2014), *appeal filed*, No. 15-1134 (2d Cir. Apr. 9, 2015).

First, the *Wiley* court rejected the "transfer" agreements as nothing "more than disguised assignments of the bare right to sue," finding that the "sole purpose" of the agreements was to "grant DRK the right to bring suit" and that they were intended to "circumvent the prohibition against allowing 'holders of rights under copyrights to choose third parties to bring suits on their behalf.'" 998 F. Supp. 2d at 283-84 (citation and internal quotation marks omitted).

Second, the *Wiley* court found that the record – materially identical to that here – provided "uncontroverted proof that the Representation Agreements are nonexclusive licenses [to DRK]," that the express language of the agreements disclaims any transfer of exclusive rights, and that it was "axiomatic that if the Representation Agreement did not specify that exclusive rights were being transferred, no such rights were in fact transferred." 998 F. Supp. 2d at 278-79. The court held that DRK's reliance on the agency representation agreements for an ownership interest "fail[ed] not only as a factual matter, but also as a legal matter." *Id.* (noting that DRK Photo's subsequent execution of the "transfer" agreements provides even further clarity to the fact that DRK Photo did not deem the representation agreements to transfer any exclusive rights).

Lastly, the *Wiley* court rejected DRK's claim that – by virtue of the financial benefit it derived from its own licensing of the photos as a non-exclusive agent of the photographers – it was a "beneficial owner" that thereby had standing to sue under § 501(b) of the Copyright Act. 998 F. Supp. 2d at 279; see ER 21, 24-25. The court held, as a matter of law, that DRK was simply not the beneficial owner of any ***exclusive*** rights, having "never owned the copyrights" or legal title to the photos on which it was the non-exclusive agent. *Wiley*, 998 F. Supp. 2d at 279.

As a result, because DRK could not satisfy the fundamental element of a copyright infringement suit – demonstrable ownership of an exclusive copyright right in the photos – the court granted partial summary judgment dismissing all but a few of DRK's claims. ER 278-79, 284, 289; *cf.* ER 20-27. This partial summary judgment ruling as to DRK's lack of standing became a final judgment on March 11, 2015. *Wiley*, Dkt. No. 134.

### C. MHE's Motion For Summary Judgment As to DRK's Lack of Standing to Assert Copyright Infringement Claims is Granted

Only hours after the *Wiley* decision on February 21, 2014, DRK – seeking another bite at the standing apple – filed its motion for partial summary judgment, remarkably asserting that it had standing under the Copyright Act to bring its claims and making absolutely no mention of the *Wiley* ruling. SER 7-25. Shortly thereafter, on March 24, 2014, MHE filed its cross-motion for partial summary judgment as to DRK's lack of standing in this case, pointing to the ineffectiveness

of the very same agreements that had been addressed, and soundly rejected, by the *Wiley* court. SER 26-62. MHE's motion argued that both under principles of collateral estoppel as well as on the substantive merits, DRK's claims to have standing to assert copyright infringement claims on photos for which it was, at most, merely a non-exclusive licensing agent were barred as a matter of law. SER 26-49.

On June 10, 2014, the District Court granted MHE's motion for partial summary judgment. ER 16-27. As a preliminary matter, the court decided not to apply the *Wiley* decision as preclusive. However, the district court held that, "[e]ven without according the [*Wiley*] decision preclusive effect, the Court is persuaded by the analysis in *Wiley* and in other cases that have found similar assignment agreements insufficient to confer standing." ER 23. The court first found that the "Representation Agreements" are merely "non-exclusive licenses" that failed to "grant DRK any *exclusive* rights under 17 U.S.C. § 106." ER 23-24. Addressing the substance of, rather than just the nominal labels DRK had applied to the "Transfer Agreements," as this Circuit commands, the district court found that they "conveyed to DRK nothing more than the 'bare right to sue.'" ER 24. The district court also rejected DRK's post-hoc attempts to fashion itself as a beneficial owner merely because it stood to gain financially from its own non-exclusive licensing of the photos. ER 24-25.

-10-

Finally, the district court also rejected DRK's newly-framed attempt to stave off dismissal wherein DRK argued that Supreme Court's decision in a trademark case, *Lexmark International, Inc. v. Static Control Components, Inc.* (*Lexmark*), 134 S. Ct. 1377 (2014), had announced a sea change in the otherwise well-established standing doctrine under section 501(b).  ER 25.  Because all that *Lexmark* did was "set out to the proper analytical framework"  for limiting standing under the Lanham Act,  15 U.S.C. § 1125(a)(1),  the district court concluded that "[n]either the formulation of this framework nor its application in *Lexmark* has the effect of **expanding** § 501(b) to grant standing to those without a legal or beneficial ownership of an exclusive right."  *Id.* (emphasis added).[4]

---

[4] Nor was this the first or last time DRK's and its counsel's scheme had been uncovered as a sham attempt to manufacture standing.  *E.g., Viesti Assocs., Inc. v. McGraw-Hill Global Education Holdings, LLC* (*McGraw-Hill*), 2015 WL 585806 (D. Colo. Feb. 11, 2015); *Viesti Assocs., Inc. v. Pearson Educ., Inc.* (*Viesti I*), 2014 WL 1055975 (D. Colo. Mar. 19, 2014); *Viesti Assocs., Inc. v. Pearson Educ., Inc.* (*Viesti II*), 2014 WL 1053772 (D. Colo. Mar. 19, 2014); *Wiley*, 998 F. Supp. 2d 262; *Minden Pictures, Inc. v. John Wiley & Sons, Inc.* (*Minden II*), 10 F. Supp. 3d 1117 (N.D. Cal. 2014), *rev'd on other grounds, Minden III*, 2015 WL 4547593; *Minden Pictures, Inc. v. John Wiley & Sons, Inc.* (*Minden I*), 2013 WL 1995208 (N.D. Cal. May 13, 2013); *Minden Pictures, Inc. v. Pearson Educ., Inc.* (*Pearson*), 929 F. Supp. 2d 962 (N.D. Cal. 2013); *see also* SER 104-15 (*Visuals Unlimited, Inc. v. John Wiley & Sons, Inc.*, No. 11143Y0065813, Case Order No. 5 (AAA Aug. 14, 2013)).  In each of these instances, the same or identically-worded "transfer" agreements, non-exclusive agency agreements, and "beneficial" ownership arguments by DRK's counsel were roundly rejected as insufficient, as a matter of law, to demonstrate ownership by those claimants of an exclusive copyright interest sufficient to assert infringement claims.

On July 1, 2014, DRK filed a motion for leave to amend seeking to add as party-plaintiffs three of the photographers for whom it had been litigating, in order to assert claims that had now all been dismissed. ER 34-48. DRK contended that it had good cause for seeking an amendment to the scheduling order because, at the time the deadline passed almost two years earlier, it believed in good faith that it had standing to bring all of the claims alleged in the complaint, and "was not aware that amendment was necessary until this Court's Order of June 10, 2014, ruling that DRK lacked standing." ER 37.

The district court rejected DRK's attempt to resurrect its case, finding that DRK could not demonstrate "good cause," as it had not acted diligently, but rather had engaged in a deliberate litigation strategy. ER 9-14. The court found that DRK knew that its claims for standing were suspect from the very beginning – both from MHE's Answer and from the parties' joint case management statement, such that "by the time the Scheduling Order was entered, DRK had notice that its standing to bring all or some of its claims was at issue." ER 11. Further, "DRK received additional subsequent notice that its standing was at issue through court decisions in other, similar litigation in which DRK's counsel represented the plaintiffs, . . . [a]ll of [which] were issued prior to the close of discovery in the present case, and prior to the date on which the parties filed their cross-motions." *Id.* (citing cases); *see supra* n.4. Indeed, even "[w]hile the motions for summary

judgment were being briefed, and several months prior to this Court's order granting summary judgment against DRK, further notice was provided to DRK through two additional decisions issued in cases in which, again, DRK's counsel represented the plaintiffs." ER 12 (citing cases); *see supra* n.4.

Moreover, because "DRK sought to amend the complaint only after this [district court] ruled against it on cross-motions for summary judgment, which was almost two years after DRK was first put on notice of the issue" the court found "DRK's failure to 'heed clear and repeated signals that not all the necessary parties had been named in the complaint does not constitute diligence.'" ER 12-13 (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)). Thus, the district court exercised its discretion to deny DRK's motion to amend, and rejected DRK's tag-along requests for "joinder" of alleged parties in interest and "ratification" as similarly barred by DRK's lack of diligence and were otherwise improper. ER 13-14.

DRK now appeals.

## SUMMARY OF THE ARGUMENT

The district court properly found that the substance and effect of the Transfer Agreements, which only nominally mentioned copyright rights, and by which the photographers had allegedly "assigned" their copyrights in photos they originally created, amounted only to assignments to DRK of a bare right to sue and therefore ineffectual for standing under 17 U.S.C. § 501(b). The summary judgment record, including DRK's own admissions, left no genuine issue of fact that DRK and its counsel had drafted the Transfer Agreements solely to manufacture the appearance of standing, and not to actually effectuate any transfer of exclusive copyright interests to DRK under section 106 of the Copyright Act.

The district court also correctly concluded that the Representation Agreements, which merely authorized DRK to serve as the photographers' ***non-exclusive*** licensing agent, did not convey any copyright ownership interest to DRK. It is well established that non-exclusive licensees, including those who have the non-exclusive contractual right to authorize others to use copyrighted works, are not legal or beneficial owners of an exclusive copyright interest. Likewise, the district court correctly held that the Supreme Court's decision in *Lexmark* did not in any way amend the express statutory requirements under section 501(b) for a plaintiff to have standing to assert infringement claims under the Copyright Act. Nor is there any merit to DRK's argument on appeal here that

-14-

the Supreme Court's decision in *Sprint Communications Co. v. APCC Services, Inc.* (*Sprint*), 554 U.S. 269 (2008), abrogated or otherwise cast doubt on the unbroken line of precedent in this, and every other, circuit holding an assignment of a bare right to sue is ineffective for standing to assert infringement claims under the Copyright Act of 1976. Further, DRK's policy arguments for judicially amending the express standing limitations under section 501(b) are misdirected to this tribunal rather than to Congress.

Finally, the district court correctly denied DRK's motion to amend the scheduling order to allow it to add three of the photographers for whom it had purported to litigate claims for well over two years after filing this action, two years after the applicable deadline in the scheduling order, months after another court had rejected all of DRK's standing arguments, and after the district court had dismissed all claims on the three photographers' photos. There was no abuse of discretion in the district court's conclusion that DRK's deliberate litigation strategy – to wait and see if its sham construct for copyright ownership panned out – demonstrated DRK's lack of diligence in seeking the amendment.

## ARGUMENT

## I. THE DISTRICT COURT PROPERLY FOUND THAT THE "TRANSFER AGREEMENTS" DID NOT ACTUALLY TRANFER ANY COPYRIGHT OWNERSHIP TO DRK

DRK's primary argument on appeal is one that this Court – and numerous others – has rejected: DRK contends the district court erred because it looked beyond the mere labels DRK inserted in its Transfer Agreements, which nominally recited a transfer of copyright. Aplnt. Br. at 14-16. DRK also wants this Court to ignore that it repeatedly admitted that the whole scheme was to create the appearance of a "transfer" of copyright rights in the photos, all so that DRK could aggregate the photographers' claims, *not* to actually acquire or exercise any *exclusive* rights under § 106. Because the well-established law requires a court to look beyond the mere labels and address the substance of what a purported copyright assignment achieves, *e.g.*, *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169-70 (9th Cir. 2013), and because the Copyright Act does not permit copyright owners to choose third-parties to bring claims on their behalf, *e.g.*, *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 889-90 (9th Cir. 2005), the district court properly rejected DRK's standing to bring infringement claims on its sham construct with the photographers.

It is well understood that "[t]he Copyright Act authorizes only two types of claimants to sue for copyright infringement: (1) owners of copyrights, and

(2) persons who have been granted exclusive licenses by owners of copyrights."

*Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 (2d Cir. 1982)

(*superseded by rule and statute on other grounds*); *Righthaven*, 716 F.3d at 1169.

As this Court has succinctly stated, "***only*** the 'legal owner or beneficial owner of

an ***exclusive*** right under a copyright has standing to sue for infringement," and

section 106 "lists the 'exclusive rights' that can be held." *Righthaven*, 716 F.3d at

1169 (emphases added) (quoting 17 U.S.C. § 501(b)). Thus, a party asserting

standing to sue for copyright infringement must actually hold one of the exclusive

rights under section 106, and critically, "[a]bsent from the list . . . is the right to sue

for infringement." *Id.* A holder of a bare right to sue simply does not have

standing under section 501(b) to assert copyright infringement claims. *Id.* (citing

*Silvers*, 402 F.3d at 890); ER 19-27.

And where, as here, agreements are proffered as the basis for standing, those

agreements must be viewed in context, and "[i]t is the substance of the agreement,

not the labels that it uses, that controls [the court's] analysis." *HyperQuest, Inc. v.

N'Site Solutions, Inc.*, 632 F.3d 377, 383 (7th Cir. 2011) (rejecting standing based

on agreement reciting grant of "exclusive license" where context reflected that

rights obtained were not exclusive); *Righthaven*, 716 F.3d at 1169-70 (holding "the

substance and effect of the contract" conclusively determines whether any

-17-

exclusive copyright rights were transferred to the putative copyright plaintiff); ER 19 *cf.* ER 236-58 (Transfer Agreements).

DRK opens with the unremarkable point that its Transfer Agreements satisfied the minimal requirements under the Copyright Act for a writing and signature. Aplnt. Br. at 15-16. But that has never been at issue and is not why the district court held DRK lacked standing. *Cf.* ER 19-25, 26-27. Rather, the mere "drafting [of] a contract calling [oneself] the copyright owner" fails to establish standing because "merely calling someone a copyright owner does not make it so." *Righthaven*, 716 F.3d at 1167-68, 1170 (holding that "assignment agreements used language purporting to transfer ownership to Righthaven is not conclusive").

DRK then argues that an assignment of ownership purely for the purposes of litigation should not be held defective, Aplnt. Br. at 17, but ignores that the evidence below demonstrated that ***both the purpose and the substance*** of the Transfer Agreements failed to ***actually*** transfer any copyright rights from the photographers to DRK. ER 19-25, 26-27; SER 131-51, 153-58; *see also Wiley*, 998 F. Supp. 2d at 280-84. Wishing that evidence to disappear, DRK – for the first time – argues that the district court impermissibly considered parol evidence, but ignores that not only did it fail to raise this argument below,[5] it submitted its own,

---

[5] *E.g.*, *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989) ("The rule in this circuit is that appellate courts will not consider arguments that are not

self-serving declarations that ***confirmed*** the substance of the Transfer Agreements was, at most, a "transfer" of a bare right to sue.  ER 130-46.

Moreover, even if DRK had not waived this argument, the district court employed precisely the approach contemplated on a summary judgment determination of the "substance and effect" of the at-issue Transfer Agreements. *See* Aplnt. Br. at 25-28; *cf. Righthaven*, 716 F.3d at 1169-70.  None of the *Righthaven* line of cases, finding transactions designed to create copyright standing to be shams, suggests that examination of the parties' true intent is limited by the parol evidence rule.  Nor does that rule preclude consideration of whether any instrument is a sham.  *See, e.g.*, *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 999-1000 (9th Cir.) (finding parol evidence doctrine inapplicable and did not bar consideration of evidence of whether a fully integrated contract was a sham), *amended on other grounds*, 272 F.3d 1289 (9th Cir. 2001).  *Jinro* upheld consideration of parole evidence to find a contract a sham to cover illegal activity, but did not suggest that such activity was a requirement of the sham doctrine, which applies whenever parties do not intend their terms to have legal effect.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 21 (1981) ("a manifestation of intention that a promise shall not affect legal relations may prevent the formation of a

_____

'properly raised' in the trial courts" and those arguments "must be raised sufficiently for the trial court to rule on it").

contract"). Indeed, because the Transfer Agreements are **not** an integrated, complete enunciation of DRK's supposed legal relationship with the photographers, even under Arizona contract law, a court properly looks beyond the four corners, and parol evidence is admissible. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993) (rejecting formulaic approach to parol evidence), *vacated in part on other grounds*, 913 P.2d 1092, 1097 (Ariz. 1996).[6]

Here, the record below indisputably demonstrates that, years after the alleged infringements by MHE, DRK asked the photographers to sign the Transfer Agreements, the "only purpose" for which was "for us [DRK] to be able to register the works for the purpose of pursuing would be infringers." SER 83-84; *see* SER 78-82; SER 137 ¶ 17; ER 259-98, 300-01. Though the form nominally stated that it "grants to DRK all copyrights and complete legal title in the [unspecified] Images," ER 236-58 & 283, DRK **repeatedly and unequivocally conceded** that "the gist of the form to me, is that they authorize us to do the registrations" and "if we take any actions against people . . . any proceeds after deduction on this would be shared 50 percent between each of us." SER 78, 137-38 ¶¶ 15-18; *see also* ER

---

[6] DRK's position that parties, through written or verbal side communications, can agree that a purported assignment shall have no effect other than conferring a right to sue, and then use the parol evidence rule as a shield ("sword" would be a better metaphor) to prevent a court's scrutiny of the true nature of the transaction, would eviscerate the standing requirement.

300-01 ("Those agreements would have been for us to register images with [the] copyright office"; "Q. Were there any other reasons for the assignment? A. Not that I recall.").  Rather than actually obtaining any exclusive copyright rights in the photos, DRK's sole "aim with this Agreement is to simply be in a legal position to bring copyright infringement claims against infringers, and to have an agreement with [photographers] as to how any settlement proceeds would be divided between us." ER 271, 288, 292.  And when the photographers expressed concern as to the **true nature** of the Transfer Agreements, DRK's principal assured the photographers that there was "no 'rights grab' going on here.  We simply want to register our website/database of images . . . so we can pursue infringers."  ER 294-97; *see also* SER 78, 137-38 ¶¶ 16-18, 20; *Wiley*, 998 F. Supp. 2d at 282 ("DRK assured its photographers that the sole basis for entering into the [Transfer Agreements] was to allow DRK to bring suit on the photographers' behalf.  DRK's e-mails to the photographers confirm that the [agreements] transferred nothing more than a blanket right for DRK to pursue copyright infringement claims.").

Other than proffering conclusory legal arguments, SER 137-39 ¶¶ 15-26; 131-32, 135-38,[7] DRK's only "evidence" in opposition to summary judgment

---

[7] *E.g.*, *Godinez v. CBS Corp.*, 81 F. App'x 949, 950 (9th Cir. 2003) ("conclusory assertions [and affidavits] are insufficient to defeat summary judgment").

below were declarations from the photographers that *confirmed* the prior testimony and admissions by DRK:  the only purpose and effect of its "transfer" agreements was to create the appearance of standing, ER 133 ¶ 5 (transfer agreements were "intended for DRK to retain copyrights until any infringement claims . . . were resolved"); ER 130 ¶ 6 ("I signed the [transfer] agreements . . . so that [DRK] could protect against unpermitted uses, by lawsuits"); *see* ER 130-46 (same);[8] SER 137-38 ¶¶ 17-18; *Wiley*, 998 F. Supp. 2d at 280-83.  Not surprisingly, DRK fails to cite *any* evidence that it and the photographers ever acted in a manner that indicated any change in ownership of exclusive rights in the photos.  Indeed, the evidence below was not only that, after the assignments, the photographers continued to retain the right to display, offer to sell, and sell licenses to use their photos, all without any accounting to DRK, *see* SER 68-75, 85-89, and DRK further *conceded* that its relationship with the photographers on the photos was governed entirely by the prior non-exclusive representation agreements, *not*

---

[8] The photographers' declarations in opposition below, stating that as the true copyright owners here they "inten[ded] to convey all rights necessary . . . for [plaintiff] to have standing," is precisely what this Court held is "invalid under the Copyright Act."  *Righthaven*, 716 F. 3d at 1171; ER 130-46, 237-58 (similar language of forms at issue).

the assignments.[9]  SER 74.  Put simply, DRK admitted that it acquired no

exclusive copyright rights under the Transfer Agreements.[10]

DRK's "sham" Transfer Agreements are thus indistinguishable from those

this Court addressed in *Righthaven*, 716 F.3d 1166.  Like DRK, Righthaven

entered into an agreement with the copyright holder purportedly assigning to

Righthaven "all copyrights requisite to have Righthaven recognized as the

copyright owner of the Work for purposes of Righthaven being able to claim

_____

[9] DRK made these admissions while testifying about the photographers' post-transfer efforts to license the their photos on their own.  SER 74 at 102:8-15, 68-75, 85-89.  DRK attempts to avoid these admissions by claiming there is no certainty that the photos the photographers were licensing were identical to those they had "transferred" to DRK, Aplnt. Br. at 27, but that argument misses the point.  DRK admitted that under its construct with the photographers, which assumed the photos were identical, the photographers remain free to license the "transferred" photos on their own because the Representation Agreements, not the Transfer Agreements, govern the relationship.  SER 68-75.  DRK also suggests that this admission cannot apply to all of the non-party photographers, Aplnt. Br. at 25, but DRK's own ***party*** admission – as to the effect (or lack thereof) of the "Transfer Agreements" – is undeniably binding upon DRK as the sole party-plaintiff.

[10] Moreover, the terms of the Transfer Agreements themselves make clear that the sole discretion that DRK could exercise was with respect to litigation.  ER 237-58.  DRK could not, for example, further alienate any of the "exclusive rights" it purported to have acquired, lest DRK violate the express requirement that it reassign the copyrights back to the photographers after litigation.  *Id.*  In fact, DRK "reassigned" copyrights immediately upon request by one of the photographers when he got wind of DRK's scheme.  ER 325-34; *cf. Righthaven*, 716 F.3d at 1168 (noting that substance of ineffectual copyright transfer agreement required that, among other things, plaintiff Righthaven "reassign" copyright to the true owner after litigation or settlement, or on demand).

ownership as well as the right to seek redress for past, present, and future infringements of the copyright . . . in and to the Work." *Id.* at 1168; *cf.* ER 237-58; *Wiley*, 998 F. Supp. 2d at 281-82. Similarly, Righthaven and its assignor also were parties to a separate agreement pursuant to which the assignor was granted a license to exploit the content that was the subject of the copyright assignment, retain the proceeds from such assignment, and the agreement – just as here – prevented Righthaven from alienating the rights it had purportedly acquired, and provided that ownership of the copyright would be reassigned back to the assignor under certain conditions, such as if Righthaven does not pursue an infringement action within a specified time or on demand from the assignor. *Righthaven*, 716 F.3d at 1168-69; *supra* n.10; *cf.* SER 68-75; ER 237-58, 325-34. Despite the apparently unambiguous language of the copyright "transfer" in *Righthaven*, this Court explained that just because "the assignment agreements used language purporting to transfer ownership to Righthaven is not conclusive. We must consider the substance of the transaction." 716 F.3d at 1170; *Wiley*, 998 F. Supp. 2d at 280-81. And in analyzing that substance, just as the district court below, this Court held that notwithstanding the instrument containing language purporting to transfer copyright, "all [that] was really assigned was a bare right to sue for

-24-

infringement." *Righthaven*, 716 F.3d at 1169-70; *Wiley*, 998 F. Supp. 2d at 284; ER 23-24, 26-27.[11]

Thus, despite DRK's attempt to distinguish this Court's precedent in *Righthaven* by arguing that its stock photo business was not "formed solely for the purpose of suing for copyright infringement," Aplnt. Br. at 18, DRK cannot escape the fact that its Transfer Agreements ***were solely for that purpose and no other*** (as DRK admitted repeatedly), and that a transfer of a ***bare right to sue to DRK was all that was substantively effectuated*** – precisely the defects that this Court (and numerous others) have deemed fatal to claims for standing under the Copyright Act. *Righthaven*, 716 F.3d at 1168-72; *HyperQuest*, 632 F.3d at 383; *Wiley*, 998 F. Supp. 2d 262; *see also McGraw-Hill*, 2015 WL 585806; *Viesti I*, 2014 WL 1055975; *Viesti II*, 2014 WL 1053772; *Minden I*, 2013 WL 1995208; *Pearson*, 929 F. Supp. 2d 962.[12]

---

[11] There is no merit to DRK's newly-minted claim that "triable issues" regarding "intent" behind the Transfer Agreements remain. Aplnt. Br. at 30. DRK failed to identify any such factual issues below, and effectively conceded every one of MHE's substantive factual assertions on summary judgment. SER 131-51; 153-60.

[12] DRK attempts to challenge the decision in *Pearson*, 929 F. Supp. 2d 962, as incorrectly decided. *See* Aplnt. Br. at 22-25. DRK ignores that *Pearson* is but one of myriad cases that have foreclosed DRK's and its counsel's attempt to manufacture the appearance of standing.

Likewise, DRK's reliance, as below, on entirely distinguishable cases, all of which lacked a comparable record and analysis of the ***substance*** of the transfer forms at issue, is misplaced. *See* Aplnt. Br. at 16. DRK again claims *Alaska Stock, LLC v. Pearson Education, Inc.* is "better reasoned" because it found DRK's counsel's forms valid. *Id.* & nn.70-71 (citing *Alaska Stock*, 975 F. Supp. 2d 1027, 1038 (D. Alaska 2013)),[13] but ignores (again) that court specifically held that – unlike here – there was ***no*** evidence demonstrating the "assignor label[ed] [the] assignment a transfer of ownership, but expressly reserve[d] the exclusive rights in the copyright to itself." *Alaska Stock*, 975 F. Supp. 2d at 1038 (emphasis added).[14]

---

[13] Another case DRK cites again, Aplnt. Br. at 16 n.71, 22-23, *Pacific Stock, Inc. v. Pearson Education, Inc.*, 927 F. Supp. 2d 991 (D. Haw. 2013), found the plaintiff had standing because its representation agreement with those photographers "provided [plaintiff] with a worldwide ***exclusive*** right to license the photographers' images," *id.* at 1000 (emphasis added), and because the record lacked evidence that the subsequent transfers were made solely to create standing, each of which is an independent reason why that case is distinguishable, *id.* at 1007. *Cf.* SER 156 n.7.

[14] Likewise, DRK urges that two arbitrators' decisions on the same Transfer Agreements should influence the disposition here. *See* Aplnt. Br. at 60. As the court in *Wiley* aptly noted, one of those tribunals expressed "hesitancy as an arbitrator" to rule on that publisher's challenge to DRK's standing, finding the issue "more appropriately should be within the domain of the federal courts with full appellate review." 998 F. Supp. 2d at 283; ER 26-27. *Wiley* – and then the district court here – properly addressed standing under those Transfer Agreements and found the arbitrators had failed to "consider the substance of the transaction[s]," as *Righthaven* compels, to determine whether in fact DRK "had been granted exclusive rights." *Wiley*, 998 F. Supp. 2d at 283-84 (holding, as a matter of law, that it had not).

Nor do court decisions addressing the assignment of copyright for purposes of registration, a context that is not governed by section 501(b)'s standing limitations, help DRK. Aplnt. Br. at 19-21. Rather, those cases reached the unremarkable conclusion that contractually authorized registrations by third parties, as expressly permitted by 37 C.F.R. § 202.3, are valid. *See Bean v. McDougal Littell*, 669 F. Supp. 2d 1031, 1035-36 (D. Ariz. 2008); *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 747 F.3d 673 (9th Cir. 2014). Unlike assignments for ***purposes of copyright registration***, which both the regulations and the law countenance, neither section 501(b) nor the uniform case law permit bare assignments of copyright – apart from the transfer of one or more exclusive rights under section 106 – for ***purposes of litigation***. *See supra* at 17-18.

Finally, DRK argues that MHE is estopped or lacks standing to challenge the Transfer Agreements, relying on cases that found a third-party should be permitted to raise the writing requirement under 17 U.S.C. § 204(a) to defeat otherwise proper infringement claims. Aplnt. Br. at 28-29; *cf.* SER 157 n.10. But this Court's precedent, *e.g.*, *Righthaven*, and the myriad cases evaluating the ***validity*** of supposed "transfers" of copyright intended to circumvent the express requirements of section 501(b) demonstrate that DRK is simply wrong, *e.g.*, *Pearson*, 929 F. Supp. 2d at 970; *Viesti I*, 2014 WL 1055975, at *4; *Viesti II*, 2014 WL 1053772, at * 7; *see also HyperQuest*, 632 F.3d at 383; *Wiley*, 998 F. Supp. 2d

262; *see also McGraw-Hill*, 2015 WL 585806.[15]  Indeed, when parties like DRK attempt to aggregate the claims of many others using form agreements purporting to transfer copyright for the purpose of bringing suit, as in *Righthaven*, *Pearson*, *Wiley*, *McGraw-Hill*, and *Viesti*, courts have not hesitated to permit defendants to challenge the sham nature of these schemes.

For these reasons, the district court correctly held, on the summary judgment record before it, that DRK had failed to demonstrate the Transfer Agreements assigned to it anything more than an ineffectual bare right to sue.

## II.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE NON-EXCLUSIVE REPRESENTATION AGREEMENTS DID NOT CONFER STANDING ON DRK

Ignoring the well-established case law, DRK also contends that the district court erred by holding the *non-exclusive* Representation Agreements fail to confer standing on DRK under section 501(b).  Aplnt. Br. at 32-45.  First, DRK argues that its *non-exclusive* contractual right to issue licenses, in and of itself, vests it with standing.  *Id.* at 32-34.  Next, DRK contorts the concept of "beneficial ownership," to encompass a mere *non-exclusive* licensing agent who stands to financially benefit from a licensing transaction.  *Id.* at 35-45.

---

[15] *See also Apparel Bus. Sys., LLC v. Tom James Co.*, 2008 WL 858754, at *13 (E.D. Pa. Mar. 28, 2008) ("Part of [defendants'] defense to the claim of copyright infringement is that the plaintiff does not own the copyrights at issue, and they are entitled to challenge the validity of the document that the plaintiff put into evidence to establish ownership.").

Both of these arguments fail as the unambiguous case law, as well as proper statutory construction, dictates that a ***non-exclusive*** licensing agent, like DRK here, simply is not a legal or beneficial owner of an ***exclusive*** copyright right. *Cf. Righthaven*, 716 F.3d at 1169 ("[O]nly the 'legal or beneficial owner of an ***exclusive*** right under a copyright' has standing to sue for infringement of that right." (emphasis added)) (citation omitted) (same); *Silvers*, 402 F.3d at 885 (the "explicit listing [under § 501(b) of the Copyright Act] of who *may* sue for copyright infringement should be understood as an *exclusion of others*"). Indeed, to countenance DRK's contentions concerning a non-exclusive licensing agent would eviscerate the express standing limitations of section 501(b).

**A.      The Non-Exclusive Right to "Authorize" Others to Use A Copyrighted Work is Not an Exclusive Right under Section 106 of the Copyright Act**

Though DRK has repeatedly admitted that the Representation Agreements are non-exclusive, SER 85 ("It is a nonexclusive arrangement"), SER 51-52 ¶¶ 3-7; 132-35; *Wiley*, 998 F. Supp. 2d at 278-79, it again contends that merely because it could (along with a host of other potential licensing agents, including the photographers themselves) authorize others to use the photos, DRK was transformed into a "legal" copyright owner. Aplnt. Br. at 32-33. Yet, not a single case DRK has cited, either to the district court or here, supports this proposition. *Cf. Wiley*, 998 F. Supp. 2d at 278 ("DRK has not cited, and there is not, a single

case finding standing based on a non-exclusive representation agreement."); *see also e.g.*, *HyperQuest*, 632 F.3d at 382 (same); *Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 937 (7th Cir. 1993) (same); *Ctr. City Music v. Kisner*, 1994 WL 159769, at *4 (4th Cir. Apr. 28, 1994) (same); *Granite Music Corp. v. Ctr. St. Smoke House, Inc.*, 786 F. Supp. 2d 716, 724 (W.D.N.Y. 2011) (same); *Hulex Music v. C.F. Maint. & Prop. Mgmt., Inc.*, 115 F.R.D. 303, 304 (D. Neb. 1987) (same).[16]

Rather than conveying any copyright ownership rights, the Representation Agreements are entirely silent as to ***any*** transfer of rights, and merely appoint DRK a ***non-exclusive*** licensing agent.  ER 183-226; *cf. Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) ("Absent an express transfer of ownership, [an author] retains ownership of his copyright.").  Yet, the power to issue licenses can be exercised not only by a copyright owner, but also by a properly authorized non-exclusive licensee.  *Eg.*, *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333 (9th Cir. 1984) (a non-exclusive licensee is permitted to sublicense if "expressly

---

[16] Every court and tribunal to consider this same argument by DRK's counsel has likewise rejected it.  *McGraw-Hill*, 2015 WL 585806, at *6 ("Agency Agreements confer a non-exclusive license to Viesti, which confers no standing to bring a copyright infringement claim."); *Viesti I*, 2014 WL 1055975, at *7 (same); *Viesti II*, 2014 WL 1053772, at *12 (same); *see also Wiley*, 998 F. Supp. 2d at 278; *Minden II*, 10 F. Supp. 3d at 1127-28; *Visuals Unlimited, Inc.*, No. 11143Y00658 13, Order No. 6 (AAA Sept. 10, 1013) (attached hereto as an addendum).

authorized to do so" (quoting NIMMER ON COPYRIGHT § 10.01[c][4] (1983)). And, despite DRK's reference to inapposite cases,[17] the *non-exclusive* "right to issue licenses" is *not* among the "exclusive rights" under section 106.

In fact, this Court's recent decision in *Minden III*, 2015 WL 4547593, confirms this principle. In addressing an appeal of a dismissal for lack of standing by another stock agency, this Court held that plaintiff agency had standing solely by virtue of representation agreements that expressly designated the agency as the "'***sole and exclusive agent*** . . . with respect to the Licensing of any and all uses' of the photos." *Id.* at *7 (emphasis added). Because "the photographers . . . promised

---

[17] None of the cases DRK places in its footnotes actually supports the argument it makes to this Court. Aplnt. Br. at 32-33 & nn.132-34. For example, *Evident Corporation v. Church & Dwight Co.*, 399 F.3d 1310, 1314 (Fed. Cir. 2005), a patent case, which DRK cites as support for its proposition that the non-exclusive right to license, on its own, is sufficient for standing, merely acknowledged that the plaintiff "as ***exclusive*** licensee to the [] patent" had standing to sue. *Id.* (emphasis added).

Further, *Armento v. Laser Image, Inc.*, 950 F. Supp. 719, 733 (W.D.N.C. 1996), actually undercuts DRK's argument as the court found that the written agreement, unlike the Representation Agreements, effectuated a complete transfer of all rights in copyright to the defendant. *Cf.* ER 183-226 (no such transfer). The case in no way supports the premise that a non-exclusive licensing agent *is* a copyright owner. *Armento*, 950 F. Supp. at 733.

Finally, the remaining cases that DRK relies on, Aplnt. Br. at 32-33 nn.133 & 134, deal with the common law transfer of copyright rights under the Copyright Act of 1909, wherein no particular formalities were required and mere possession of a work, by itself, could have effectuated a transfer of rights. *E.g.*, *Urantia Found. v. Maaherra*, 114 F.3d 955, 960 (9th Cir. 1997); *Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036, 1086 (C.D. Cal. 2009); *cf. Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990).

that Minden*, and only Minden*, will have the power, as the photographers'
licensing agent, to authorize third parties to reproduce, distribute, and display the
photographs," it qualified as a holder of an exclusive copyright interest sufficient
to assert infringement claims. *Id.* (emphasis added) (noting that it was not
consequential that "the photographers have retained some limited degree of
authority to grant licenses themselves" because such licensing "does not eliminate
Minden's interest in the copyright *as the sole entity to act as the photographers'
licensing agent*" (emphasis added)).

Here, the Representation Agreements at issue *do not* expressly make DRK
the "sole entity" authorized to issue licenses to others. ER 183-226 (simply
appointing DRK as *an* agent for the photos); *cf.* ER 228, 231, 234 (Representation
Agreements *no longer* at issue and not part of this appeal); *see supra* n.3. Rather,
as the language of the agreements make clear – and as DRK repeatedly conceded
below – its Representation Agreements were both expressly non-exclusive and the
photographers were permitted to – and did – authorize other agents to issue
licenses to others for use of their photos. SER 65-66, 68-75, 85-89, 94-102. Thus,
DRK's non-exclusive right to license under the Representation Agreements stands
directly at odds with the *Minden III* panel's conclusion that even if the "right 'to
authorize'" one of the rights enumerated under § 106 is itself an "exclusive right"
under the copyright law, a sufficient ownership interest for standing to assert

-32-

infringement claims only arises when such a "right" is expressly exclusive. *Minden III*, 2015 WL 4547593, *5, *6-7.  For this reason, this Court's conclusion in *Minden III*, that "the divisibility principle" of the Copyright Act of 1976 "appl[ies] with equal force when the interest granted is ***an exclusive*** license to grant licenses to others," *id.* at *6 (emphasis added), is of no avail to DRK.

In sum, the language of the non-exclusive Representation Agreements transferred ***no*** exclusive copyright ownership in any of the section 106 rights to DRK, nor did they transfer any ***exclusive*** right to license the photos to others, and therefor confer no ***legal*** standing under section 501(b) on DRK to assert the copyright infringement claims here.  Put simply, this Court has found that an "assignment [which] was admittedly ***non-***exclusive," as here with DRK, gives a plaintiff "no standing to sue for copyright infringement."  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1146 (9th Cir. 2008); SER 117-30 (*Premier Tracks, LLC v. Fox Broad. Co.*, No. 12-cv-01615 DMG (PJWx) (N.D. Cal. Dec. 18, 2012) (Doc. 41)).

## B. DRK's Status as a Non-Exclusive Licensing Agent Does Not Make It A Beneficial Owner of an Exclusive Copyright Interest

DRK also argues that, even if it was not the legal owner of any exclusive copyright rights under the Representation Agreements, this Court should "flexib[ly]" define "beneficial" ownership to include a non-exclusive licensing agent like itself, so as to provide with standing under section 501(b).  Aplnt. Br. at

44-45. DRK's resort to various definitions of "beneficial" and "equitable" ownership, *id*. at 35-41, all suffer from the same fatal flaw: DRK ignores that it never held, acquired, or parted with any ***exclusive*** section 106 interests in the photos at issue by virtue of its ***non-exclusive*** Representation Agreements. As before, none of the cases DRK cites lends any support to the proposition that "beneficial ownership" should extend to mere non-exclusive licensing agents. And, more importantly, DRK's contortions of the "beneficial" ownership principle are not supported by any reasonable statutory construction and would render the plain statutory standing limitations under sections 101 and 501(b) a nullity.

Courts in this Circuit (and all others) have repeatedly defined a "beneficial owner" as "an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees."[18] *Ray Charles Found. v. Robinson*, 919 F. Supp. 2d 1054, 1067 n.11 (C.D. Cal. 2013); *Fantasy, Inc. v. Fogerty*, 654 F. Supp. 1129, 1131-32 (N.D. Cal. 1987) (same); SER 117-30 (*Premier Tracks* (same)); *see also Viesti I*, 2014 WL 1055975, at *4; *Viesti II*, 2014 WL 1053772, at *12; *Minden II*, 10 F. Supp. 3d at 1130-31 (rev'd on other

---

[18] *See also* WILLIAM F. PATRY, 2 PATRY ON COPYRIGHT § 5:152 n.1 (2014) ("A beneficial owner must first have been a legal owner."); *see also id.* ("An author or other owner of copyright who transfers all of his or her exclusive rights may still be considered a 'beneficial owner' if he or she retains an ongoing material financial interest in the exploitation of the work.").

grounds); *Wiley*, 998 F. Supp. 2d at 279. This Court has squarely rejected the notion that a party with simply a share in royalties, absent an existing or reversionary interest in "rights of authorship" of a copyrighted work, is somehow transformed into a beneficial owner. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1144-45 (9th Cir. 2003).

DRK instead resorts again to pre-1976 Copyright Act cases for the irrelevant premise that "many cases [previously] described beneficial ownership as . . . 'equitable [in] nature.'" Aplnt. Br. at 37. DRK then leaps to the illogical conclusion that "'anyone [with] a substantial interest in the exploitation of one or more of the exclusive rights'" in a copyright must therefore have standing. Aplnt. Br. at 33-35 (citing *Order of St. Benedict of N.J. v. Steinhauser*, 234 U.S. 640 (1914), and *Wooster v. Crane & Co.*, 147 F. 515 (8th Cir. 1906)).[19] DRK conveniently ignores that this Court has previously discredited such cases, stating:

> [these cases were] decided before the 1976 Copyright Act was enacted and thus ***do[] not bear on how we should interpret § 501(b)***.

*Silvers*, 402 F.3d at 889 (emphasis added) (citations omitted).[20] Moreover, in *Steinhauser*, the plaintiff ***was*** in the chain of title (whether described as legal or

---

[19] Notably, section 501(b) of the 1976 Act, does ***not*** state that "anyone [with] a substantial interest" can institute an action for an infringement of that interest.

[20] Though DRK cites *Smith v. Casey* as supporting its premise, Aplnt. Br. at 38-39, this case – as all the others in DRK's brief – merely adheres to the Ninth

equitable), having acquired the deceased author's works at issue as part of his "membership under the [the Order's] constitution." 234 U.S. at 651.[21] Here, DRK did not acquire any *exclusive* rights to the photographers' photos under the Representation Agreements.

At the end of the day, DRK cannot submit a single case holding that a non-exclusive licensing agent can be considered a "beneficial" owner. [22]

---

Circuit precedent (and uniform precedent in other circuits) by recognizing beneficial ownership in "an author who assigns his legal rights to a work in exchange for royalties from its exploitation." 741 F.3d 1236, 1241-42 (11th Cir. 2014).

[21] Likewise, the plaintiff in *Wooster v. Crane & Co.*, Aplnt. Br. at 38, had the contractually-based "*exclusive* right to print, publish, and vend" the books. 147 F. 515, 515 (8th Cir. 1906) (emphasis added). The court's reference to "equity" arose solely because the 1909 Act only permitted the "proprietor" or "legal" owner of the copyright to sue, *not* an exclusive licensee. *Id.* at 516.

[22] DRK's attempt to distinguish the ASCAP and BMI cases is unavailing. Aplnt. Br. 42. First, there are numerous cases, beyond just those addressing music licensing organizations, holding that mere non-exclusive "licensing agents" are not legal or beneficial owners of any § 106. *E.g.*, *supra* n.4 (citing cases); *see Plunket v. Doyle*, 2001 WL 175252, at *5 (S.D.N.Y. Feb. 22, 2001) (licensing agent of literary works); *Original Appalachian Artworks, Inc. v. Schlaifer Nance & Co.*, 679 F. Supp. 1564, 1572 (N.D. Ga. 1987) (licensing agent for television show producer); *MSC Music Am., Inc. v. Yahoo! Inc.*, No. 3:09-cv-00597, 2009 WL 4348593. at *1 (M.D. Tenn. Nov. 24, 2009) (holding that a "licensing administrator and an exclusive licensing agent of the copyrights" lacks standing to sue for copyright infringement); *Comptoir de l'Industrie Textile de France v. Fiorucci, Inc.*, 1979 WL 1062, at *2 (S.D.N.Y. Apr. 10, 1979) (finding that exclusive sales agent for copyrighted fabric lacks standing). Second, in the ASCAP and BMI consent decrees, those organizations, which are responsible for non-exclusive licensing of music works to others, are declared to be non-exclusive

*Warner/Chappell Music, Inc. v. Blue Moon Ventures*, Aplnt. Br. at 39 n.158, stands only for the uncontroverted proposition that an ***exclusive*** agent – unlike DRK here – of the copyright holder has standing to pursue copyright infringement claims. No. 3:10-1160, 2011 WL 662691, at *3, *4, *5 (M.D. Tenn. Feb. 14, 2011) (holding that because plaintiffs were "vested with the ***sole and exclusive right*** to license and exploit the musical composition" they "have standing to bring suit . . . as the ***exclusive licensee***" (emphases added)).

Likewise, *Moran v. London Records, Ltd*., 827 F.2d 180, 183 (7th Cir. 1987), merely posits that there ***may*** be an instance where a beneficial ownership interest arises outside the legal chain of tile, but the court does not actually address those circumstances. *Cf.* Aplnt. Br. 43-44 (claiming the district court erred by failing to consider this case, but ignoring that the parties have briefed this point below); *cf.* SER 159-60. Rather, *Moran* held that a creator of work under a work-for-hire arrangement – which by operation of statute vests copyright rights entirely in the employer – and who retained a contractual entitlement to additional monies for further uses of that work, was ***not*** vested with beneficial ownership because "[t]ransferring economic rights not amounting to legal title in any exclusive right

_____

licensees, Aplnt. Br. at 42 n.175, which is precisely what DRK has admitted to being, as well, *see supra*.

-37-

under the copyright" does not confer "beneficial ownership."[23]  In fact, *Moran*, as every other court, rejects a transfer of a financial interest alone, all that DRK obtained under the Representation Agreements, as sufficient for "beneficial ownership" under section 501(b) for standing.

Even if this Court were to address which parties (other than authors who have parted with legal title) might qualify as beneficial owners, traditional principles of statutory construction are fatal to DRK's convoluted theory.  Though the term "beneficial" is not defined anywhere in the Copyright Act, the related concept of a "beneficiary" is repeatedly referenced in the legislative history, and, in *every* instance, the concept is grounded in the estate or trust of the author of a

---

[23] Although *Pfizer Inc. v. Teva Pharmaceuticals USA, Inc.*, 803 F. Supp. 2d 409 (E.D. Va.), Aplnt. Br. at 39 n.158, holds that a "beneficial" owner of a patent has standing to sue, DRK ignores the fact that the two entities that court found to have standing were both in the legal chain of title.  803 F. Supp. 2d at 420, 424. Rather than support DRK's theory, this case too contradicts it; DRK was never the author of any of the photos, nor did it ever part with legal title, and all it acquired under the Representation Agreements was a non-exclusive authority to issue licenses.

Nor did, as DRK claims, *Dun & Bradstreet, Inc. v. Walter*, 1991 WL 32749, at *3 (N.D. Ill. Mar. 7, 1991) *find* a beneficial ownership outside a chain of legal title, *cf.* Aplt. Br. at 39 n.157; that court simply refused to grant a *motion to dismiss* because the complaint sufficiently *alleged* copyright ownership in the database at issue, and when "coupled with the allegation that Dun & Bradstreet [legal copyright owner] and DMS [putative "beneficial owner"] are both subsidiaries [and were both party-plaintiffs] of the same parent corporation," there existed "a *reasonable inference* that DMS is the beneficial owner of the copyright."  1991 WL 32749, at *3 (emphasis added).

particular work – i.e., "his or her widow or widower, children, executors, or next of kin."[24]

In that vein, "beneficial owners" may include, for example, various beneficiaries of the *exclusive* copyright in works under a will or trust, or perhaps those to whom a fiduciary duty is owed on the copyrights.[25] *See Moran*, 827 F.2d at 183. But, as demonstrated to the court below, DRK has no past, present, or future interest in *any exclusive* copyright rights in the photos at issue. SER 159-60. Nor does DRK cite any circumstances that would give rise to a fiduciary duty running from the photographers to DRK. *Cf. id.* Rather, as MHE demonstrated, any fiduciary duties run exactly the opposite direction, as the photographers hold nothing for the benefit of DRK; DRK freely and repeatedly admitted the photographers always remained free to license their own photos, authorize other agents to do so in competition with DRK, and have absolutely no duty to account to DRK. *See supra* at 7, 22; *cf.*, *e.g.*, *Viesti I*, 2014 WL 1055975, at *6 (noting that

---

[24] *See, e.g.*, H.R. REP. NO. 94-1476, at 140 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5756 (comparing right to terminate transfer or license of copyright rights and renewal of copyright rights); *id.* at 140-41 (referring to "any statutory *beneficiary*" in the context of intestate succession of renewal rights (emphasis added)); *id.* at 125 (discussing classes of beneficiaries in joint works and termination rights).

[25] *See also* MELVILLE B. NIMMER & DAVID NIMMER, 3 NIMMER ON COPYRIGHT (NIMMER ON COPYRIGHT) § 12.02[D] (2014) (positing "[p]resumably, [the beneficial ownership] reference is intended to the general law of trusts in this regard").

no beneficial ownership can arise were stock photo agency "has no claim, under the [representation agreements], to royalties from [the photographer's] use of the copyright"); *Viesti II*, 2014 WL 1053772, at *12 (same). "Because [DRK's] economic interests are derived solely from its own use of the copyright and not from the use of the copyright by its legal owner [the photographers]," DRK "is not a beneficial owner pursuant to § 501(b)." *Viesti I*, 2014 WL 1055975, at *6; *Viesti II*, 2014 WL 1053772, at *12.

In sum, the district court correctly concluded that under the Representation Agreements, DRK is merely a ***nonexclusive*** licensing agent for the photographers, and, having never owned the copyrights (or parted with them), DRK simply is not a legal or "beneficial" owner of any exclusive interest in the photos at issue.

## III. THE SUPREME COURT'S RULINGS IN *LEXMARK* AND *SPRINT* DID NOT ALTER OR AMEND THE REQUIREMENTS FOR STATUTORY STANDING UNDER 17 U.S.C. § 501(b)

### A. *Lexmark* Does Not Amend or Alter the Analysis under 17 U.S.C. § 501(b)

Abandoning its unsuccessful efforts to address relevant case law, DRK returns to its strained reading of the Supreme Court's decision in *Lexmark*, a case solely addressed to trademark infringement, to argue that standing under the Copyright Act has undergone a sea change. Aplnt. Br. at 45-55. DRK urges this Court to ***ignore*** section 501(b)'s express limitations on standing under the Copyright Act, arguing that under *Lexmark*, "[a] statutory cause of action" extends

-40-

to plaintiffs who can meet the "'zone of interests and proximate causality'" test, *id.* at 46-47, irrespective of what the express language of the Copyright Act might ***first*** require for putative plaintiff. But this argument is entirely without merit, and as the district court correctly reasoned, whatever the import of *Lexmark*, it did not change the express requirements for copyright standing under section 501(b) of the Copyright Act. ER 25 ("*Lexmark*'s zone of interest and proximate cause tests are of no assistance to DRK because DRK, as neither a legal nor beneficial copyright owner, does not have standing to sue under the plain language of 15 U.S.C. § 501(b).").

Indeed, rather than expanding statutory standing, *Lexmark* reaffirms the principles that "suppl[y] the relevant ***limits*** on who may sue" when a statute's standing provision ***is phrased broadly***. 134 S. Ct. at 1391 (emphasis added). Indeed, as the Court notes, the Lanham Act provision at issue appears to "authorize[] suit by '***any person who believes that he or she is likely to be damaged***' by a defendant's false advertising." *Id.* at 1388 (emphasis added) (quoting 15 U.S.C. § 1125(a)(1)(B), which permits suits for false advertising or false association). "***Read literally, that broad language might suggest that an action is available to anyone who can satisfy the minimum requirements of Article III***," such as "[a] consumer who is hoodwinked into purchasing a disappointing product," among many other potential plaintiffs. *Id.* at 1388-90

(emphasis added). Yet, the statute's "broad language notwithstanding," the Court found that standing for such a plaintiff had been universally rejected "by every Circuit to consider the question," though with disparate tests adopted in the process. *Id.* at 1390.

*Lexmark*, consistent with **narrowing** the unbounded language of the Lanham Act, then adopted the appropriate test **for *limiting*** standing where, despite a seemingly expansive standing provision, there is an "unlikelihood that Congress meant to allow ***all*** factually injured plaintiffs to recover." *Id.* at 1388 (emphasis added).[26] The Court concludes that for the Lanham Act, "a direct application of the zone-of-interests test and the proximate-cause requirement supplies the relevant *limits* on who may sue." *Id.* at 1391 (emphasis added).

As the district court and others have concluded, nothing in *Lexmark* suggests that the zone-of-interests test may be used to ***expand*** standing to persons outside of an express statutory limitation on standing. ER 25 ("[*Lexmark*'s] holding cannot plausibly be viewed as expanding standing under a different statute."); *McGraw-Hill*, 2015 WL 585806, at *8. To the contrary, *Lexmark* simply reiterates that a court is required to determine if a plaintiff "has a cause of action under the statute,"

---

[26] The *Lexmark* opinion also makes clear that its holding does not involve copyright standing but pertains "only to Static Control's Lanham Act claim." 134 S. Ct. at 1385 n.2.

which "requires us to determine the meaning of the congressionally enacted provision creating a cause of action" and further requires that "[i]n doing so, *we apply traditional principles of statutory interpretation*." 134 S. Ct. at 1387-88 (emphasis added).

Applying properly these "traditional principles of statutory interpretation," *id.*, this Court's precedents hold that "*only* the 'legal or beneficial owner of an exclusive right under a copyright' has standing to sue for infringement of that right." *Righthaven*, 716 F.3d at 1169-70 (emphasis added) (citation omitted); *Silvers*, 402 F.3d at 890; ER 19. As discussed *supra*, the district court correctly found that DRK is neither the legal nor beneficial owner of any exclusive copyright rights in the photos. Having failed to satisfy the express statutory prerequisite, it matters not whether DRK contends it meets the "zone of interests and proximate causality" test. *Ray Charles Found.*, 919 F. Supp. 2d at 1069-70 ("[A] plaintiff asserting a claim under the Copyright Act *must be statutorily authorized to bring the claim*. . . . If it has no standing under § 501(b), then it would make no difference if the 'zone of interests' created by § 501(b) to protect beneficial owners extended" to the plaintiff's claim (emphasis added)).

As one Ninth Circuit judge succinctly noted in rebuffing DRK's counsel's identical attempt to perpetuate this strained line of reasoning, *Lexmark* is properly

seen as "not changing the law of copyright infringement one whit." Oral Argument at 1:27-1:38, 0:30-1:52, *Minden III*.

**B. DRK's Policy Arguments in Favor of Expanding the Class of Parties with Standing to Sue Under the Copyright Act Are Misdirected**

DRK's policy arguments concerning the *Lexmark* decision and the supposed difficulty of enforcing low-value copyright claims tacitly concede that its arguments are foreclosed under the existing statutory framework. Aplnt. Br. at 53-54.

*First*, DRK's contention that "as a practical matter, . . . many or most of its contributing photographers will have no ability to pursue their infringement claims," is simply false. *Id.* at 54. In fact, many photographers represented by DRK's own counsel have filed their own copyright infringement actions against textbook publishers in the aftermaths of similar dismissals of aggregated claims for lack of standing.[27] Nor was DRK hamstrung from asserting contract claims on the

---

[27] *Compare Pearson*, 929 F. Supp. 2d 962, *with Lanting v. Pearson Educ., Inc.,* No. 2:13-cv-03318-FSH-MAH (D.N.J. filed May 23, 2013); *Brandenberg v. Pearson Educ., Inc*., No. 2:13-cv-03319-FSH-MAH (D.N.J. filed May 23, 2013); *Ellis v. Pearson Educ., Inc.*, No. 2:13-cv-03320-FSH-MAH (D.N.J. filed May 23, 2013); *Nicklin v. Pearson Educ., Inc*., No. 2:13-cv-03176-FSH-MAH (D.N.J. filed May 20, 2013); *Bavendam v. Pearson Educ., Inc.*, No. 2:13-cv-03096-FSH-MAH (D.N.J. filed May 15, 2013); *Clifton v. John Wiley & Sons, Inc*., No. 4:13-cv-02923-JSW (N.D. Cal. filed June 25, 2013). *Compare McGraw-Hill*, 2015 WL 585806, *with Engelbert v. McGraw-Hill Global Educ. Holdings, LLC*, No. 5:14-cv-02062-LS (E.D. Pa. filed Apr. 8, 2014).

invoicing at issue, it simply *chose* not to. Nothing prevented DRK and its counsel from asserting properly cognizable causes of action from the very beginning – other than their scheme to improperly aggregate *copyright infringement* claims purely to enable an *in terrorem* threat of massive statutory damages.[28] Indeed, DRK's counsel *admitted* in oral argument before this Court in the *Minden III* case that one of the main reasons it did not simply join all the photographers as the proper copyright plaintiffs *ab initio* was to protect them from the burdens and obligations of discovery (and to add a layer of abstraction to MHE's and the other publisher's efforts to obtain *party* discovery).[29] That is not a reason for this Court to read out the express standing requirements that Congress imposed under the Copyright Act.

*Second*, the Copyright Act reflects Congress' consideration of authors' rights and remedies for infringement, and provides for certain incentives to those authors who timely register their works, including the availability of statutory

---

[28] *E.g., Righthaven LLC v. Wolf*, 813 F. Supp. 2d 1265, 1271 (D. Colo. 2011) ("[I]n light of the severe statutory damages for copyright infringement and the burdensome costs of litigation, a party sued for infringement, even a party with a meritorious defense, will often agree to settlement.").

[29] See Oral Argument at 13:33-14:28, *Minden III*, 14-15267 (9th Cir. Mar. 13, 2015), *available at* http://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000007385 (video) (admitting that the decision not to bring suit on behalf of the photographers as party-plaintiffs from the beginning was because "discovery then begins including depositions . . . of all those plaintiffs . . . and costs associated with that").

damages and attorneys' fees. *E.g.*, 17 U.S.C. §§ 412, 504(c), 505; *Olander Enters. Inc. v. Spencer Gifts, LLC*, 812 F. Supp. 2d 1070, 1077 (C.D. Cal. 2011) (discussing Congress' statutory incentives under the Copyright Act). Congress chose not to create a small claims court or afford additional incentives to authors who do not timely register their works. As DRK's own authority concedes, "[t]o implement these proposals, ***Congress would need to amend limited portions of the governing Copyright Act***."[30] Congress has not done so, and "a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied." *Lexmark*, 134 S. Ct. at 1388.

### C. *Sprint* Did Not Even Remotely Touch Upon, Let Alone "Abrogate" This Court's Holding (and the Universal View) That a Bare Right to Sue Is Ineffectual for Statutory Standing Under 17 U.S.C. § 501(b)

DRK attempts to invoke *Sprint*, 554 U.S. 269, Aplt. Br. 55-58 & n.228, as grounds for this Court to overrule its *Silvers* and *Righthaven* precedents (and implicitly every other circuits' case law as well), and permit DRK to proceed on the basis of its "bare right to sue." DRK falsely claims that, in the wake of *Sprint*, "[c]ourts today are divided on whether copyright law allows third parties to bring

---

[30] DAVID NIMMER, PROPOSAL FOR SMALL COPYRIGHT INFRINGEMENT CLAIMS 9 (Jan. 17, 2012) (emphasis added), *available at* http://www.copyright.gov/docs/smallclaims/comments/05_american_photographic_artists.pdf; *cf.* Aplnt. Br. at 54 & nn.214, 215.

infringement action when they acquire the bare right to sue."[31]  There is simply no such split of authority.  *E.g.*, *Righthaven*, 716 F.3d at 1169; *HyperQuest*, 632 F.3d at 381-82; *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 484 (1st Cir.1985); *Eden Toys, Inc.*, 697 F.2d at 32 & n.3; *Righthaven LLC v. Wolf*, 813 F. Supp. 2d 1265, 1271-73 (D. Colo. 2011).

While DRK's attempt to leverage *Sprint* as a basis for this Court to judicially amend the Copyright Act and depart from the well settled-case law limiting standing to only legal and beneficial owners of an exclusive copyright interest is impressive for its brashness, it is telling that not a single case has viewed *Sprint* as abrogating standing under section 501(b) in the **seven years** since it was issued. And the reason is simple:  *Sprint* did not involve claims for copyright infringement, but rather addressed standing for claims accruing under the Communications Act of 1934 for "dial-around" calls.  554 U.S. at 271.  Unlike in the Copyright Act, Congress did not expressly limit the status (based on subsisting property rights or otherwise) of parties entitled to such a cause of action under the

---

[31] Aplnt. Br. at 56 & n.219 (citing law review article which misstates the applicability of *Prather v. Neva Paperbacks, Inc.*, 410 F.2d 698, 700 (5th Cir. 1969), and implicitly claiming it permitted such bare assignments under the 1976 Act).  As this Court has previously noted, *Prather* was decided long **before** section 501(b) was enacted and "thus does not bear on how we should interpret § 501(b)." *Silvers*, 402 F.3d at 889 ("The predecessor to the 1976 Act, the 1909 Act, simply afforded the 'proprietor' of a copyright the right to sue for infringement.").

Communications Act.  *Id.  Sprint* says absolutely nothing about whether an "aggregator" of *copyright* claims, like DRK here, who is neither a "legal or beneficial owner," has standing to sue under section 501(b).

DRK's vision of *Sprint*, like its arguments advocating an unbounded definition of beneficial ownership, *see supra*, would read out the express language that Congress adopted under section 501(b).  In both cases, DRK has chosen the wrong forum in which to urge amending the Copyright Act.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REJECTING DRK'S ATTEMPT TO FUNDAMENTALLY RESHAPE THE CASE AFTER TWO YEARS

DRK's final argument on appeal contends the district court's refusal – after more than two years of litigation – to amend the scheduling order so that DRK and its counsel could join three photographers as plaintiffs to assert claims on photos the district court had dismissed in their entirety in its partial summary judgment order, was in error.  Aplnt. Br. at 58; *cf*. ER 9-14.  According to DRK, the district court should have permitted DRK to (i) ignore the court's scheduling order deadline for such amendments, (ii) ignore the well-established copyright law extant before filing this case that barred suit by holders of the bare right to sue, (iii) ignore a series of decisions in which its counsel were repeatedly and unequivocally told that its sham "transfer" forms were ineffectual under section 501(b) to assert aggregated infringement claims, issued *both before and after the summary*

-48-

*judgment deadline* in the scheduling order, (iv) ignore MHE's clear challenges to DRK's standing assertions from the inception of the case, (v) ignore that the *Wiley* court had actually and definitively ruled that DRK lacked standing on the Transfer and Representation Agreements at issue here, and instead spend months briefing the same issues to the court hoping that it would reach an inconsistent conclusion. SER 161-79; ER 9-14. DRK's theory is that it should have been permitted to wait for the district court's summary judgment ruling before any "diligence" requirement applied to its motion for leave to amend. Aplnt. Br. at 58-60. Because a deliberate litigation strategy is not evidence of DRK's diligence, as MHE demonstrated below, there is no basis for finding the district court made any error – let alone clearly abused its discretion – in denying DRK's untimely motion. *Johnson*, 975 F.2d at 607 (district court's decision regarding preclusive effect of pretrial order "will not be disturbed unless they evidence a clear abuse of discretion" (quotation omitted)); *cf.* ER 9-14.

   *First*, the district court correctly noted that where, as with DRK here, "a party seeks leave to amend a complaint after a pretrial scheduling order has been entered pursuant to Fed. R. Civ. P. Rule 16(b)(1), and after the designated deadline for amending pleadings has passed, the party must first make a showing of 'good cause' under Rule 16(b)(4)." *Johnson*, 975 F.2d at 608) ("[A] party seeking to amend pleading after date specified in scheduling order must first show good cause

for amendment under Rule 16(b), then, if good cause be shown, the party must demonstrate that amendment was proper under Rule 15." (citation and internal quotation marks omitted)); ER 9-10. Moreover, when a party seeks leave to amend after the deadline imposed by the scheduling order, it cannot simply "appeal to the liberal amendment procedures afforded by Rule 15," *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 952 (9th Cir. 2006), but rather must demonstrate it was diligent in seeking the amendment, *Johnson*, 975 F.2d at 609. "If the party seeking the modification was not diligent, the inquiry should end and the motion to modify should not be granted." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (citation and internal quotation marks omitted); *cf.* ER 9-10.

Just as it does here, DRK argued below that it "believed in good faith that it had standing to bring all of the claims alleged in the complaint and that it 'was not aware that amendment was necessary until this Court's Order of June 10, 2014, ruling that DRK lacked standing. (Doc. 134 at 4.).'" ER 10; SER 161-79;. This Court has previously addressed similar circumstances, holding a plaintiff that fails to "heed clear and repeated signals that not all the necessary parties had been named in the complaint" does so at his peril and his conduct "does not constitute diligence." *Johnson*, 975 F.2d at 609. DRK's delay through February 2014 was inexcusable, but after that it was brazen. DRK's decision to affirmatively move for summary judgment on the same day the very same bases DRK asserted for

standing were definitively rejected by the court in *Wiley* (with no mention of that case in DRK's affirmative motion filed just hours ***after*** the decision), SER 7-25, 165 & n.1, demonstrates that DRK ***chose*** to take its chances as the sole party-plaintiff through the summary judgment decision by the district court here. ER 12-13; SER 161-79; *cf. Modus LLC v. Encore Legal Solutions, Inc.*, 2014 WL 1493000, at *4 (D. Ariz. Apr. 16, 2014) (finding plaintiff was not diligent as it waited three months from another court's decision that it claimed necessitated the amendment to add new claims).

That DRK ***chose*** to further litigate its standing for months – without seeking leave to amend – ***after*** the *Wiley* decision is fatal to its contentions of any error; DRK's 13th-hour motion for leave was purely an improper attempt to "circumvent summary judgment." [32] *Nix v. Dalton*, 1996 WL 742437, at *2 (9th Cir. 1996)

---

[32] *See also Lewis v. Russell*, 2012 WL 4711959, at *5 (E.D. Cal. Oct. 3, 2012) (finding bad faith where "[i]t appears that the motivation behind the City choosing this late date to amend its cross-complaint is to survive summary judgment. When the moving party has such a motivation, 'its motive weighs against granting leave to amend'" (footnote and citations omitted)); *Foust v. Page*, 2014 WL 1791250, at *4 (D. Ariz. May 6, 2014) (finding lack of diligence where plaintiff knew of the facts underpinning the motion for leave to amend to add new plaintiff but nevertheless allowed "the fact discovery deadline to pass . . . the summary judgment deadline to pass . . . , and another six weeks to pass before they filed a motion to amend their complaint"); *In re Zicam Cold Remedy Mktg., Sales Practices, and Prods. Liab. Litig.*, 2010 WL 3719908, at *1 (D. Ariz. Sept. 15, 2010) (denying leave to amend because plaintiff did not act diligently in adding the proposed new party, having "delayed months, not days" in moving for leave to amend).

("[A] motion for leave to amend is not a vehicle to circumvent summary judgment." (citation omitted)); *Acri v. Int'l Assoc. of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir. 2011) (affirming denial of leave to amend where request was made to avoid an adverse summary judgment ruling and "plaintiffs' delay in bringing [the motion for leave] was a tactical choice because he felt that the causes of action already stated were sufficient"); *Henderson v. City & Cty. of S.F.*, 2006 WL 3507944, at *17 (N.D. Cal. Dec. 1, 2006) (finding bad faith and denying leave where "plaintiffs waited to amend until they had the opportunity to assess the merits of defendants' summary judgment motion"); *J.P. Morgan Chase Bank, N.A. v. Drywall Serv. & Supply Co.*, 265 F.R.D. 341, 349 (N.D. Ind. 2010) ("[I]t is not an adequate explanation that [plaintiff] felt it had to amend its complaint because it was dissatisfied with the court's decision on its summary judgment motion."); *see also Kleinhans v. Lisle Sav. Profit Sharing Tr.*, 810 F.2d 618, 625 (7th Cir. 1987) (finding motion by plaintiff "represents an apparent attempt to avoid the effect of summary judgment on his other claims" and "[b]ecause granting [plaintiff's] motion to amend after such an inexcusably long delay would unduly prejudice the defendants," it was properly denied); *cf.* SER 161-79 (demonstrating prejudice that MHE would incur if court were to grant leave to amend).

Finally, DRK argues that the district court failed to adequately address its

**conclusory** request for joinder and/or intervention, *cf.* ER 43-46; Aplnt. Br. at 59,

by finding that it "was not appropriate in this case."  DRK ignores that the

propriety of any joinder or intervention is governed,[33] in the first instance, by the

very same principles of diligence as the district court found lacking in DRK.[34]

*E.g.*, *NAACP v. New York*, 413 U.S. 345, 365-66 (1973)("Whether intervention be

claimed of right or as permissive, it is at once apparent, from the initial words of

---

[33] Rule 24's timeliness prerequisites govern intervention by nonparties in a litigation, including where intervention is permitted unconditionally by statute. *NAACP v. New York*, 413 U.S. 345, 365 (1973) ("Intervention in a federal court suit is governed by Fed. Rule Civ. Proc. 24"); *Iridium India Telecom Ltd. v. Motorola, Inc.*, 165 F. App'x 878, 879-80 (2d Cir. 2005) ("Rule 24(a) by its own terms requires that, even if an applicant has an 'unconditional right' [to intervene] . . . the application must still be 'timely'").

[34] The district court properly rejected any "ratification" under Rule 17(a)(3), *cf.* Aplnt. Br. at 59, because none of the three photographers identified in DRK's untimely motion for leave to amend had any property interest in the photos that remained at issue in this dispute; each and every claim on those photographers' photos had been dismissed as part of the court's order on partial summary judgment.  *See* SER 51-52 ¶ 6 (listing claims that were dismissed); ER 27; *see also Minden II*, 10 F. Supp. 3d at 1132 ("To allow a copyright owner to 'ratify' the filing of an action would be to effectively allow after-the-fact assignment of the bare right to sue") (citing cases); *Fed. Treasury Enters. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 83-84 (2d Cir. 2013) (holding that allowing a non-party to enlarge standing by using Rule 17 would violate the Rules Enabling Act, which prohibits the use of the Rules to enlarge a substantive right under the Copyright Act), *cert. denied*, 134 S. Ct. 1291 (2014); *Lans v. Gateway 2000, Inc.*, 84 F. Supp. 2d 112, 122 (D.D.C. 1999) (refusing to permit ratification by real party in interest where "failure to sue in the name of [the proper party] was not "an honest and understandable mistake"), *aff'd sub nom. Lans v. Digital Equip. Corp.*, 252 F.3d 1320 (Fed. Cir. 2001); *cf.* ER 13-14.

both Rule 24(a) and Rule 24(b), that the application must be 'timely.' ***If it is
untimely, intervention must be denied***." (emphasis added)); *United States v.
Washington*, 86 F.3d 1499, 1503 (9th Cir. 1996) ("If the court finds that the motion
to intervene was not timely, it need not reach any of the remaining elements of
Rule 24."); *Wolfenbarger v. Black*, 2008 WL 590477, at *3 (E.D. Cal. Feb 29)
(amendment or joinder under Rule 20 is governed by the same timeliness
requirements of Rules 15 and 16),[35] *report & recommendation adopted by* 2008
WL 838721 (Mar. 28, 2008)  Likewise, and implicitly, the very same prejudice to
MHE would flow from any post-summary judgment intervention.  *See* SER 161-
79; *cf. Matsumoto v. Republic Ins. Co.*, 792 F.2d 869, 872-73 (9th Cir. 1986)
(affirming district court's refusal to permit joinder of a new party "[b]ecause the

---

[35] DRK's cursory request below for "joinder" of the three photographers
fails because simply waiting for a final adverse decision – especially after the
*Wiley* court rejected DRK's claims of standing – is ***not*** evidence of excusable
delay.  *See, e.g., Jicarilla Apache Tribe v. Hodel*, 821 F.2d 537, 539 (10th Cir.
1987) (affirming untimeliness determination and approving district court's finding
that the applicant's delay was "a conscious tactical judgment"); *see also Choike v.
Slippery Rock Univ. of Penn. of State Sys. of Higher Educ.*, 297 F. App'x 138, 141-
42 (3d Cir. 2008) ("'To the extent the length of time an applicant waits before
applying for intervention is a factor in determining timeliness, it should be
measured from the point at which the applicant ***knew***, or ***should have known***, of
the ***risk to its rights***.'" (emphases added) (citation omitted)); *Oklahoma ex rel.
Edmondson v. Tyson Foods, Inc.*, 619 F.3d 1223, 1232 (10th Cir. 2010) (courts
"measure delay from when the movant was on notice that its interests ***may not be
protected*** by a party already in the case" (emphasis added)).

motion was made after discovery had commenced and at the same time [defendant] moved for summary judgment").

Not surprisingly, another of DRK's counsel's attempts to resuscitate its clients' improper infringement aggregation schemes through an 11th-hour motion to intervene also was rejected as untimely. *McGraw-Hill*, 2014 WL 3766185 (D. Colo. July 30, 2014) (finding DRK's counsel's belated attempt to intervene on behalf of a dozen photographers, whose claims were improperly aggregated by that plaintiff agency, to have been untimely under Rule 24 as a matter of law).

In sum, there is thus no doubt that the district court acted within its discretion by denying DRK's motion for leave to amend. *E.g.*, *Zivkovic*, 302 F.3d at 1087 (inquiry into propriety of a motion for leave to amend is at an end if moving party cannot show it was diligent under Rule 16).

## <u>CONCLUSION</u>

For the foregoing reasons, MHE respectfully requests that this Court affirm the judgment of the district court.

Dated: July 31, 2015          By s/ *Christopher P. Beall*

Christopher P. Beall
Thomas B. Kelley
Michael Beylkin
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1888 Sherman Street, Suite 370
Denver, CO  80203
Telephone:  (303) 376-2400
Fax: (303) 376-2401
cbeall@lskslaw.com
mbeylkin@lskslaw.com

*Attorneys for Appellees McGraw-Hill Global
Education Holdings, LLC and McGraw-Hill
School Education Holdings, LLC*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,989 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2010, Times New Roman, font size 14.

Dated:  July 31, 2015

_____*s/ Christopher P. Beall*_____

Christopher P. Beall
LEVINE SULLIVAN KOCH & SCHULZ, LLP

*Attorneys for Appellees McGraw-Hill Global Education Holdings, LLC and McGraw-Hill School Education Holdings, LLC*

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Circuit Rule 28-2.6 of this Court's Rules of Appellate Procedure,

MHE states that there are no related cases.

**<u>ADDENDUM</u>**

THE AMERICAN ARBITRATION ASSOCIATION

```
*********************************
Visuals Unlimited, Inc.,              *
                                      *
        Claimant,                     *        Case No.: 11 143 Y 00658 13
                                      *
            v.                        *
                                      *
John Wiley and Sons, Inc.,            *        Case Order No. 6
                                      *
                                      *
        Respondent.                   *
*********************************
```

Before me is the issue, framed by Case Order No. 5, and the ADR Agreement at paragraphs 5(d) and 5(e), of whether Visuals Unlimited, Inc. ("VUI") has produced "sufficient written evidence of standing" to pursue copyright infringement claims against John Wiley and Sons, Inc. ("Wiley") in connection with photographs submitted by contributors whose claims were not reached by Case Order 5 and two contributors (Cunningham and Science VU) whose claims VUI has asked to be reconsidered. [1]  I have received and reviewed written submissions by VUI and Wiley that include argument, law, and the documents that VUI relies upon as "evidence of standing."  These remaining infringement claims must be dismissed.

The principal issue before me is the meaning of Representation Agreements such as Wiley Ex. 2, an Agreement between VUI and Albert Copley.   Para. 3.1 of that Agreement conveys a purportedly "exclusive license".   Setting aside deficiencies in documentation related to particular contributors, the documents that VUI submitted do not satisfy its burden to prove its standing to assert infringement for the contributors at issue.  Bearing in mind the rule that "it is

---

[1] There are several discrepancies between VUI's schedule of remaining claims and Wiley's summary chart.  VUI's schedule includes claims for Science VU/B. John Cabisco, but Wiley's summary chart does not.  Wiley's summary chart includes VUI as a claimant, but VUI's schedule does not.

5859406.1

A-1

the substance of the agreement, not the labels that it uses"[2] controls the analysis of exclusivity, I

consider not only the reference to an "exclusive license" in para. 3.1 of the Representation

Agreements at issue, but those Agreements as a whole and the related agreements that VUI

submitted for my consideration.

     VUI's Representation Agreements with Contributors at issue contain the following

provision[3]:

> 3.1  Subject to the terms of this Agreement, CONTRIBUTOR
> grants COMPANY a worldwide, exclusive license, with a right to
> grant sub-licenses, to, reproduce, distribute, publish, transmit,
> broadcast, display, exhibit, adapt, crop, modify, recast or enhance,
> any Image, alone or in combination with any other material, any
> media or embodiment, now known or later developed, for any
> purpose . . ..

In the same Section of each Representation Agreement, the following provision

appears[4]:

> 3.3 CONTRIBUTOR agrees not to supply to any Images to other
> Stock Picture Library.  Notwithstanding, CONTRIBUTOR may
> license any Images directly.

     Language is used casually in the Representation Agreements.  For example, the

Contributor's reserved right to license in para. 3.3 prevents a reader from giving the term

"exclusive license" in paras. 3.1 and 3.4 the meaning for which VUI advocates.[5]  It is well

recognized that a contract must be read as a whole, and that each term should be given meaning,

if possible.  Yet VUI has not offered or with evidence supported an interpretation of the

---

[2]   *Hyperquest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 383 (7th Cir. 2011)("*Hyperquest*").

[3]   Contributor Agreements were not submitted for all of the Contributors at issue.  There was no Contributor Agreement for the team of Kessel and Shih, and no separate agreement for Shih that would fill the gap.  No document was produced that would establish Lori Calentine's right to license the work of Robert Calentine.

[4]   Para. 3.3 of the Hutchings and Hosler Representation agreements more narrowly describe the Contributor's retained rights to "license directly".  In view of my interpretation of para. 3.1, this difference is inconsequential.

[5]   The Contributor's reserved right to "license directly" would, for example, permit it to deal directly with publishers if he or she chose.  That being so,  VUI would be considered a non-exclusive licensee.  *Broadcast Music, Inc. v. CBS Inc.*, 221 U.S.P.Q. 246, 1983-2 Trade Cases, ¶¶ 65, 551 (SDNY 1983).

- 2 -

Representation Agreement that takes into account para. 3.1 and both parts of para. 3.3 and vindicates its claim to having received an exclusive license to exercise and sublicense the exercise of all of the enumerated Section 106 rights. Based on the documents provided, and after much consideration, I conclude that it is more likely than not that the exclusive right that the Representation Agreements confer upon VUI is only the right to be the Contributor's sole licensing representative, or Stock Picture Library, for his or her work. This reading gives meaning to both sentences of para. 3.3 as supplementing para. 3.1. Thus, the first sentence of para. 3.3 contains Contributor's agreement not to supply Images to any other Stock Library— that is, para. 3.3 secures VUI's exclusivity as a Stock Picture Library representing Contributor not only for Accepted Images, which are covered by para. 3.1, but also for any other Images that Contributor creates. The second sentence of para. 3.3 makes clear that VUI's position as Contributor's sole licensing representative does not prevent Contributor from engaging in certain licensing activities personally. Para. 3.1 necessarily empowers VUI, as Contributor's sole representative in the marketplace for stock photographs, to license others to exercise Section 106 rights, or to sublicense others to extend such licenses. But the right to license is not one of the Section 106 rights. When read in context, Para. 3.1 does not support a claim by VUI to own any Section 106 right to the exclusion of Contributor.

The foregoing interpretation of the license granted by Section 3 of the Representation Agreement is consistent with other terms of the Agreement. The consideration that VUI provides the Contributor is the undertaking to "use commercially reasonable efforts to market and license Accepted Images" (Para. 8.1.2) and to account for and pay Contributor's share of the license fees (Para 4.1). Section 2.2 of the Representation Agreement states that "CONTRIBUTOR retains copyright in its Accepted Images." The Contributor's reservation of

5859406.1

all copyrights is confirmed in the additional documentation that VUI provided.  Thus, each Right to Sue Agreement and/or an Assignment Agreement that VUI provided identifies the Contributor as "the sole owner" or "the owner" of the copyrights in the Contributor's Accepted Images.

In order to establish its standing, VUI would have had to provide documents with respect to each Contributor sufficient to demonstrate  "clearly delineated exclusivity over at least one strand of the bundle of [copy]rights"[6].  It did not do so.

To the extent that it is  necessary to reach VUI's argument that it co-owned Section 106 rights with the Contributor,  I find that argument unpersuasive.  VUI has provided no authority for the proposition that an an author can convey a license that has the exclusivity required to effect a transfer of ownership of a particular copyright under Section 101 while at the same time retaining the right to do exactly what it authorized the licensee to do.  While I acknowledge that co-ownership of copyright may arise from joint creation, or result from the conveyance, in one transaction, of a copyright to a group of transferees,  I cannot find that VUI and its Contributor were co-owners of any Section 106 exclusive right.[7]

The foregoing analysis disposes of VUI's claim of standing to assert copyright claims for Copley, Slaven, Hossler, Gerald and Buff Corsi, Bishop, Winters, Hutchings, Kessel, Kessel and Shih, Kessel and Kardon, Kardon, Calentine, Cunningham and Science VU.  The Cunningham and Science VU claims fail for the additional reason that the supporting documents were not produced within the time frame required by the ADR Agreement, as extended by my order.  VUI did not provide any written evidence of standing to sue for copyright infringement of the work covered by Registration Number VA 0001762019 or any work by Science VU/B. John Cabisco.

---

[6]  *Hyperquest* at 383.

[7]  VUI relies on *Chirco v. Gateway Oaks*, ____F. Supp. 2d___, 2005 WL 2284218, *6 (E.D. Mich. 2005).  Neither the facts nor the reasoning of this opinion are sufficiently developed to support the novel principle that VUI contends that I should adopt.

- 4 -

5859406.1

A-4

Having now addressed all of the copyright claims for which VUI claimed standing, I direct the parties to submit, by September 28, 2013, a proposed order to be entered under Paragraph 5(e) of the ADR Agreement, including a schedule of dismissed claims, as previously described in para. 8b of Case Order No. 5.  I adopt the parties' proposed schedule, submitted today, for briefing  with respect VUI's fraud and contract claims.   All other orders remain in effect except to the extent amended by this order.

Date:   September 10, 2013

_____

Deborah A. Coleman, Arbitrator

5859406.1

United States Code Annotated
  Title 17. Copyrights (Refs & Annos)
    Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos)

17 U.S.C.A. § 106

§ 106. Exclusive rights in copyrighted works

Effective: November 2, 2002
Currentness

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

**CREDIT(S)**

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2546; Pub.L. 101-318, § 3(d), July 3, 1990, 104 Stat. 288; Pub.L. 101-650, Title VII, § 704(b)(2), Dec. 1, 1990, 104 Stat. 5134; Pub.L. 104-39, § 2, Nov. 1, 1995, 109 Stat. 336; Pub.L. 106-44, § 1(g)(2), Aug. 5, 1999, 113 Stat. 222; Pub.L. 107-273, Div. C, Title III, § 13210(4)(A), Nov. 2, 2002, 116 Stat. 1909.)

Notes of Decisions (245)

17 U.S.C.A. § 106, 17 USCA § 106
Current through P.L. 114-25 approved 6-15-2015

End of Document                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 17. Copyrights (Refs & Annos)
    Chapter 5. Copyright Infringement and Remedies (Refs & Annos)

17 U.S.C.A. § 501

§ 501. Infringement of copyright

Effective: November 2, 2002

Currentness

**(a)** Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be. For purposes of this chapter (other than section 506), any reference to copyright shall be deemed to include the rights conferred by section 106A(a). As used in this subsection, the term "anyone" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.

**(b)** The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it. The court may require such owner to serve written notice of the action with a copy of the complaint upon any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright, and shall require that such notice be served upon any person whose interest is likely to be affected by a decision in the case. The court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright.

**(c)** For any secondary transmission by a cable system that embodies a performance or a display of a work which is actionable as an act of infringement under subsection (c) of section 111, a television broadcast station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local service area of that television station.

**(d)** For any secondary transmission by a cable system that is actionable as an act of infringement pursuant to section 111(c)(3), the following shall also have standing to sue: (i) the primary transmitter whose transmission has been altered by the cable system; and (ii) any broadcast station within whose local service area the secondary transmission occurs.

**(e)** With respect to any secondary transmission that is made by a satellite carrier of a performance or display of a work embodied in a primary transmission and is actionable as an act of infringement under section 119(a)(5), a network station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local service area of that station.

**(f)(1)** With respect to any secondary transmission that is made by a satellite carrier of a performance or display of a work embodied in a primary transmission and is actionable as an act of infringement under section 122, a television broadcast station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local market of that station.

**(2)** A television broadcast station may file a civil action against any satellite carrier that has refused to carry television broadcast signals, as required under section 122(a)(2), to enforce that television broadcast station's rights under section 338(a) of the Communications Act of 1934.

**CREDIT(S)**

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2584; Pub.L. 100-568, § 10(a), Oct. 31, 1988, 102 Stat. 2860; Pub.L. 100-667, Title II, § 202(3), Nov. 16, 1988, 102 Stat. 3957; Pub.L. 101-553, § 2(a)(1), Nov. 15, 1990, 104 Stat. 2749; Pub.L. 101-650, Title VI, § 606(a), Dec. 1, 1990, 104 Stat. 5131; Pub.L. 106-44, § 1(g)(5), Aug. 5, 1999, 113 Stat. 222; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title I, §§ 1002(b), 1011(b)(3)], Nov. 29, 1999, 113 Stat. 1536, 1501A-527, 1501A-544; Pub.L. 107-273, Div. C, Title III, § 13210(4)(B), Nov. 2, 2002, 116 Stat. 1909.)

Notes of Decisions (1483)

17 U.S.C.A. § 501, 17 USCA § 501
Current through P.L. 114-25 approved 6-15-2015

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 31, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


            *s/ Christopher P. Beall*
            Christopher P. Beall

            *Attorneys for Appellees McGraw-Hill Global Education Holdings, LLC and McGraw-Hill School Education Holdings, LLC*